IN THE MATTER OF OCEAN COUNTY COLLEGE, RESPONDENT-APPELLANT, AND GINA ALVEN, TERESA CORBETT, DAILY M. SMITH AND EFFIE T. CLARK, CHARGING PARTIES-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued June 4, 1985—Decided July 9, 1985.

Before Judges MICHELS, PETRELLA and BAIME.

*Seymour J. Kagan* argued the cause for appellant (*Berry, Kagan, Privetera & Sahradnik*, attorneys).

*Linda K. Stern* argued the cause for respondents (*Sterns, Herbert & Weinroth, P.A.*, attorneys; *Michael J. Herbert, Linda K. Stern* and *Melinda R. Martinson* on the brief).

*Don Horowitz*, Deputy General Counsel, argued the cause for Public Employment Relations Commission (*Robert E. Anderson, Jr.*, General Counsel, attorney; *Don Horowitz* on the brief).

PER CURIAM.

Ocean County College (College) appeals from a decision and order of the Public Employment Relations Commission (PERC)

which found that the College engaged in unfair labor practices in refusing to hire three individuals as instructors under a one-year contract it had to provide educational services for the United States Army at the Fort Dix Army Installation (Fort Dix).

PERC concluded that the College refused to hire Gina Alven, Daily Smith and Effie Clark, three of four charging parties,[1] as instructors because of their exercise of rights guaranteed by the New Jersey Employer-Employee Relations Act *N.J.S.A.* 34:13A–1, *et seq.* (EERA).

The College argues that: (1) PERC did not have jurisdiction because the charging parties were never public employees and are not public employees under EERA; (2) the charging parties, even if hired, would not have been public employees entitled to collectively bargain under EERA, and (3) PERC erroneously concluded that the College engaged in unfair labor practices in refusing to hire the three charging parties who are respondents on this appeal. With respect to the last issue it argues that there was no evidence upon which PERC could reasonably find that there had been any unfair labor practice involving any of the charging parties. In addition, the College argues that the hearing examiner and PERC, in ordering that three of the charging parties be paid as if they were employees for the term of the College's contract with the Army, erred in failing to require mitigation of damages. All the parties concede that there was error in this regard and that in the event of an affirmance mitigation is required.

The charging parties filed unfair practice charges with PERC on March 18, 1983 in which they alleged that they had not been

---

[1]PERC's decision is reported at 10 *N.J.P.E.R.* ¶ 15230 at 502–504 (1984). PERC agreed with the finding of the hearing examiner that the College did not violate *N.J.S.A.* 34:13A–5.4a(1) and (3), and hence did not commit an unfair labor practice when it failed to hire a fourth charging party, Teresa Corbett. No cross-appeal has been filed from that aspect of the PERC decision and that issue is not before us.

hired by the College to fill their former positions as instructors at Fort Dix because they had engaged in attempting to organize a union or engaged in other protected activities. They asserted that the College violated *N.J.S.A.* 34:13A–5.4a(1) and (3). The matter was eventually tried before a hearing examiner on three separate dates. On the last hearing date, the College advised the hearing examiner and the attorney for the charging parties that the Department of the Army had awarded the contract for instruction at Fort Dix for the next year to another bidder. The charging parties thereafter no longer sought reinstatement, but sought declaratory relief that there had been unfair labor practices and sought compensatory damages.

The hearing examiner issued his decision approximately six months after the last hearing date and concluded that the College violated *N.J.S.A.* 34:13A–5.4a(1) and (3) of the EERA in refusing to hire Alven, Smith and Clark. He concluded, however, that the College's refusal to hire a fourth charging party, Teresa Corbett, was not a violation. PERC concurred with the hearing examiner's findings and conclusions and ordered the College to cease and desist from discriminating in regard to hiring by refusing to hire job applicants because of exercise of rights guaranteed by the EERA and from interfering with the exercise of such rights. It also ordered the College to pay the charging parties the salaries they would have earned if they had been hired in the College's program as if employed by the College at Fort Dix from October 1, 1982 through September 30, 1983, with interest at 12% added to the amount due on October 1, 1983 to the date of payment. The complaint of Corbett was dismissed. As previously noted, no consideration was given to mitigation of damages, although that is not an issue on this appeal because the parties, as well as counsel for PERC, agree that there was error in that regard. In view of our disposition of this appeal, we need not address this error any further.

Although the charging parties essentially claimed that they were refused employment because of anti-union animus, the

College sharply disputed the claim and had asserted throughout that it or its personnel did not learn of any union organizational attempts of any of the individual charging parties until after the College made the decision not to extend an employment offer to the charging parties. Testimony was presented by the College before the hearing officer that it refused to rehire petitioners for independent reasons and based solely upon the job applications, the demeanor of the individuals at the interviews and reports from fellow employees and supervisors.

Alven and Smith had been instructors in English as a Second Language (ESL) and Clark was a Basic Skills instructor who had been employed for the previous contract term at Fort Dix by Johnson and Wales College (Johnson and Wales), a private institution which had the contract for instruction at Fort Dix just before the College was awarded the contract for one year. Under Johnson and Wales' contract with the United States Army, it was to provide instructional services to personnel on the military base for the period from October 1, 1981 to September 30, 1982. In September 1982 the College was awarded a one-year contract for the period of October 1, 1982 to September 30, 1983.

Prior to any involvement by the College, Alven had contacted a field representative for the New Jersey Education Association (NJEA) with the intent of establishing an NJEA affiliate at Fort Dix. She was given NJEA authorization to act as exclusive representative for collective negotiations with the employer pursuant to *N.J.S.A.* 34:13A–5.3. Apparently there were some 50 to 55 Johnson and Wales employees at Fort Dix. Alven distributed authorization cards to approximately 30 to 35 of them. By April 1982, thirteen authorization cards had been signed by her colleagues, including Smith, Corbett and Clark.

The charging parties presented testimony that Alven had engaged in additional organizing activities, including holding a meeting in July 1982 which was attended by many of those who had signed authorization cards. She apparently informed those

present that a second meeting would be scheduled for September 29, 1982.

In early September 1982, after the College learned it had been awarded the new contract, it gave responsibility to Dr. John Riismandel, Director of Special Programs, to do the initial work with respect to hiring personnel to run the program. Dean C.B. Cargile, Jr., who was also the affirmative action officer at the College, was responsible for making sure that the hiring took place in accordance with College rules and regulations. Cargile was also directly involved in dealing with the labor unions at the College. There were four bargaining units then operating at the College, all affiliated with NJEA.

On September 24, 1982 Riismandel met with personnel at the Fort Dix Education Center to discuss the transition and the advertisements that were to appear in the newspapers over the weekend. He also met with Maureen McKeever, who had been the Johnson and Wales Contract Administrator and who arranged the September 24 meeting. It was proposed that the College hire some of the employees that were working in the education program at Fort Dix under the Johnson and Wales contract. Apparently, Johnson and Wales had followed a similar procedure with its predecessor.

At that meeting the transition was discussed, including rates of pay for each job title and the fact that the pay was not negotiable. The charging parties were told that for their job classifications the pay was $8 per hour. Applications to work at the College were made available at that time. Advertisements to supplement hiring from Johnson and Wales employees were placed in newspapers over the weekend of September 25 and 26, 1982. Approximately 200 applications were submitted. Interviews were conducted by Dr. Riismandel on September 27 and 28, and he spoke to over 100 people.

The first of the charging parties interviewed was Alven. She told Riismandel that she was first hired at Fort Dix in July 1978 by the Army as an English instructor. In January 1979 Bur-

lington County College was awarded a contract by the Army to provide the educational services to Fort Dix personnel. Johnson and Wales was awarded the contract for the period of October 1, 1981 to September 30, 1982. During this time Alven served as an instructor and was supervised by McKeever. The interview with Riismandel lasted five or ten minutes. Alven testified that Riismandel inquired as to the length of time she worked with the program and whether she enjoyed her job. He told her that he would contact her shortly. Riismandel testified that his impressions of Alven were that she was qualified "on paper," but that she did not strike him as being professional in appearance or manner, nor did she seem to be paying attention to him. Alven had requested a higher salary on her application than the nonnegotiable minimum that the Johnson and Wales employees were told was applicable. Riismandel said that he was not particularly impressed with Alven because:

> She did not strike me as being professional in appearance or manner. She was considerably agitated, did not seem sometimes to hear what I was saying. I had to repeat questions a number of times, and I just wasn't impressed with her potential as an instructor for a quality E.S.L. program that we intended to run.

Prior to informing applicants of the results of interviews, Riismandel requested McKeever to supply information and a professional assessment on each Johnson and Wales applicant. McKeever told him of the union organizational campaign prior to his discussions with her regarding the charging parties, he testified that no names had been discussed and that he told McKeever that he did not care about the alleged organizational activities. In addition, Riismandel testified that a Sgt. Ortiz of the Army wanted a meeting with him to make recommendations on the holders of the ESL positions. Ortiz was the first sergeant of the ESL Company which was the unit being trained by the ESL instructors. He apparently had direct contact and direct knowledge of the teaching and performance of the ESL instructors because the students were in his charge, and he talked to them every day. Riismandel testified that Ortiz gave recommendations with respect to the six current

holders of ESL positions, three of whom were among the charging parties. Riismandel testified that Ortiz told him there were two fundamental reasons why he did not recommend that Alven be hired. He said:

> He found her extremely difficult to get along with. He did not believe she had a good influence on the troops, and he used the word 'fraternized'; that she had taken troops home with her. I asked him what that meant and why it was important, and he said, 'That is not allowed.'

Apparently the contract between Johnson and Wales and the Army regulations prohibited socializing or fraternizing with personnel. Although an objection was made to this testimony, the hearing officer allowed it to stand, but refused to allow Riismandel to testify further about his conversations with Ortiz because he viewed fraternization as a collateral matter and because there was no reference to it in Riismandel's October 6, 1982 memorandum to Assistant Dean Cargile which stated reasons for not hiring Alven, Smith, Clark and Corbett.[2]

Riismandel said that after he interviewed more people on September 28 he discussed the applications with the Dean of Instruction at the College. Riismandel recommended that Alven not be hired because she would not fit into the program the College wanted to run and did not have the personality and attitude he was looking for in an instructor. Both that Dean and Dean Cargile agreed with Riismandel's decision.

Riismandel met again with Alven on the afternoon of September 29, 1982 to inform her that she would not be hired because

---

[2]There was a broad reference to attitude and personality. The hearing officer clearly erred in precluding such further testimony which was admissible not necessarily for its truth, but to show the state of mind of Riismandel and his reasons for not hiring Alven. A written statement from Sgt. Ortiz was marked for identification but was refused admission into evidence, and further testimony pertaining to the discussion was precluded by the hearing officer. That statement also indicated that Ortiz had negative recommendations concerning Smith and Corbett as well as Alven. Although the charging parties questioned appellant's reference to that discussion in the record, not only is such testimony in the record (the hearing officer specifically allowed the testimony up to that point to stand), but the PERC decision made reference to it. 10 *N.J.P.E.R.* ¶ 15231 at 505, n. 3.

of her attitude and personality. Alven acknowledged that Riismandel had told her he had asked people about her at Fort Dix, and that those discussions were confidential. Alven also said that Riismandel told her that "the college didn't want to be involved in any problems." Riismandel testified that the "problems" that he was referring to at the interview were the problems the College would face if he disclosed confidential information or if he further explained to her why she was not hired.

Smith was first employed by the Army in January 1970 as a Reading and Basic Skills teacher and worked for the Army until Burlington County College was awarded the contract in 1979. At that time she became an ESL instructor and continued as such under the Johnson and Wales contract.

Although Riismandel had indicated that the pay for her position was a nonnegotiable $8 per hour, Smith requested $9 based on her experience and her salary with Johnson and Wales. When she asked if a higher salary could be negotiated if she waived insurance benefits, Riismandel advised that salary was not negotiable.

Riismandel indicated that there were various reasons, including the request for higher salary, that Smith was not offered a position by the College. Smith's application contained misspelled words and a misstatement with respect to her employment records concerning time lost from work due to illness. She had indicated on her application that she had not lost any time from work on account of illness. However, school records offered into evidene at the hearing contradicted her application and showed that she had taken more than eight sick days for the 1981–1982 school year. Smith said that she had misunderstood the question and thought it referred to a substantial block of time for an absence rather than a day or two here or there.

Riismandel would not tell Smith the names of persons from whom he obtained information about her. When Smith men-

tioned her qualifications, she said that Riismandel said that "there's nothing that I can say about your qualifications." She was informed that the decision not to hire her was based on her attitude and personality. Riismandel testified that when he advised her she was not going to be hired, she became angry and threatened to sue the College. Riismandel said that prior to October 1, 1982 he was unaware of any union activity by Smith.

Clark had served in a teaching position at Fort Dix through the Salem County Vocational Technical High School program and became a substitute teacher for the ESL program at the military installation in July 1982 during the Johnson and Wales contract. She became a Basic Skills instructor on August 6, 1982.

Riismandel testified that in evaluating Clark for employment, he had considered her lesson plan which contained grammatical errors. He said that these errors were of particular concern to him because Clark was teaching Basic Skills to soldiers. Riismandel asked Clark if she would like to be considered for another position in the program. Clark testified that she would and that her first choice would be the ESL program. On September 29, 1982 Riismandel told Clark that she would not be hired because someone more qualified had been found who had a certification. Clark testified that she thought she had heard it from others, but could not swear to it, that that person only had a Bachelor's degree. Clark claimed to have a master's degree (an M.P.T.).

Riismandel testified that he was unaware of Alven's or the other complainants' union activities prior to October 1, 1982. He did acknowledge that prior to October 1, 1982 McKeever had informed him that there had been an organizational campaign for a union, but that McKeever had not mentioned any names. Riismandel had responded to McKeever that that did not matter. He also testified that any union activity had no impact on his decision to hire or not to hire. McKeever was

called to testify by the charging parties and testified to the same effect.

Riismandel also acknowledged that he met with McKeever prior to refusing to offer positions to the charging parties to seek a brief professional assessment of the work performance of each applicant then currently employed by Johnson and Wales. McKeever's superior, James Lyle, had instructed her to provide Riismandel with information regarding Johnson and Wales employees. McKeever recommended that Alven not be hired because of her "attitude," and that Smith not be hired based on her "personality." Riismandel testified that the competency of Alven and Smith became irrelevant once he became aware of their attitude and personality problems.

Although McKeever and Lyle knew of the organizing activities under the Johnson and Wales contract, McKeever testified that she advised Lyle of these activities and was told by him as well as Johnson and Wales' attorney not to discuss the union, but to listen and obtain information. Each charging party admitted that she had no conversation with Dr. Riismandel or any other College personnel regarding the union. None of the charging parties discussed the union with McKeever.

The hearing officer and PERC placed significance on an August 19, 1980 letter sent to the Army Contracting Office Administrator at Fort Dix signed by five individuals, including two of the charging parties (Clark and Smith). The letter expressed certain "concerns" about the fact that the staff appeared to have no rights that the contractor had to recognize and that the staff had rights protected under state and federal law, "e.g. Equal Pay and Equal Employment Opportunity." The letter also asked five numbered questions about the contract between Johnson and Wales and the Army.

Riismandel acknowledged that McKeever had given him a copy of this letter prior to his decision on hiring. He testified

that the letter was brought to his attention through Army personnel because the Army was very concerned about the letter, particularly as a breach of the chain of command. Riismandel testified in response to the hearing examiner's questions that the contents of that letter and the signatories did not weigh at all in his decision to hire or not to hire. He stated that the contents were as irrelevant to him as they were to the Army. What concerned him was that the letter had been sent in the first place. Riismandel did concede that every one of the Johnson and Wales employees, approximately 50 to 55 individuals, were apparently offered positions, except the charging parties.[3]

At the time of the hearing McKeever was no longer employed by Johnson and Wales or the College. She indicated that she had recommended that Alven and Smith not be hired based on their attitudes and personalities. She also indicated that she had received a copy of the complaint letters signed by five of the Johnson and Wales employees, including Smith and Clark, but that she had never given the names of the persons active in . union organizing to Riismandel. Lyle of Johnson and Wales also recommended that Alven and Smith not be hired for the same reasons given by McKeever.

Dean Cargile testified that he was unaware of any union organizing activities prior to hiring personnel to fill the contract at Fort Dix and that no names of any specific applicant were discussed until Dr. Riismandel had interviewed them. He had not talked with McKeever before October 1, 1982. He testified that he did not look at the applications during the hiring process and that Riismandel told him that in his judgment Clark was incompetent and not as well qualified as other applicants. Cargile said Riismandel told him about Alven fraternizing with

---

[3]It was represented to us at oral argument that this apparently included the three other people who had signed the letter to the Army.

the troops in violation of the contract and that she had an attitude and personality problem.

The hearing examiner appeared to recognize that the issue was not whether McKeever, Lyle or Johnson and Wales had anti-union animus, or whether there was any proof thereof, but whether there was proof that the College and its personnel had such anti-union animus. Nevertheless, notwithstanding that there was no testimony to establish it, the hearing examiner and PERC concluded that McKeever and Lyle of Johnson and Wales had direct knowledge of union organizing activities. Moreover, despite the lack of any testimony or proof, the hearing officer also concluded that McKeever and Lyle imparted to the College's representatives the names of those involved and that the College determined not to hire Alven on that basis. He also concluded that because Riismandel had direct knowledge of the signers of the letter to the Army which Smith and Clark had signed, and that the letter impacted upon his hiring decision,[4] the reasons given by the College for their nonhiring were inadequate. The hearing examiner concluded that the College violated the Act in refusing to hire Smith and Clark. PERC accepted the findings of the hearing examiner and found violations of the Act.

As noted, the College argues that the charging parties are not public employees under *N.J.S.A.* 34:13A–1, *et seq.* and that PERC did not have jurisdiction over their complaint. In light of our determination we need not decide whether there was another remedy or another State agency which could have handled their complaint, if indeed PERC did not have jurisdiction. See *Hackensack v. Winner*, 82 *N.J.* 1 (1980). Nor need we reach the further issue raised by the College that the charging parties would not have been "public employees" entitled to collectively

---

[4]He had actually testified that he was not so much concerned with the content of the letter as the fact that it was sent and that the Army had expressed alarm over its being sent, particularly because it was outside the chain of command.

bargain under the New Jersey Employer-Employee Relations Act even if they had been hired.

The parties acknowledge that no decision heretofore has held that a job applicant may be considered a public employee. Nor would we so hold. That is a different issue from whether a public employer may discriminate in its hiring practices. Although we conclude that the pivotal issue is whether there was evidence to support the fact findings below, the following comments bear on the jurisdictional issue.

It is clear that both the State Constitution, *N.J. Const.*, 1947, Art. I, para. 19 and the EERA, treat private section employees and public employees differently. PERC was created under *L.* 1968, *c.* 303 by engrafting the public sector law on to the private sector mediation law. Some provisions of *c.* 303 are common to both laws. Thus, the language relied on by PERC as including the term "employee" and "any employee" was that which existed prior to the enactment of *L.*1968, *c.* 303. The prior language was modeled after federal law and had applied only to private sector employees. The term "public employee" was added as an amendment to *N.J.S.A.* 34:13A–3(d) in 1968 and was defined in the following words: "This term [employee] shall include any public employee, *i.e.*, any person *holding a position*, by appointment or contract, or employment in the service of a public employer, except elected officials, members of boards and commissions, managerial executives and confidential employees." [5] (Emphasis added).

Hence, the definition of public employee as enacted in 1968 was an employee who actually held a position. This is essentially the College's argument. Nevertheless, *L.*1974, *c.* 123, enacted the unfair practices section of the EERA. That section was subsequently amended by *L.*1979, *c.* 477 (effective July 1, 1980) to substitute "public employers" for "employers" to make

---

[5] The exception clause was amended by *L.*1974, *c.* 123, § 2.

it clear that the section only applied to "public employers" and their representatives or agents.

PERC found violations of *N.J.S.A.* 34:13A–5.4a(1) and (3) which read:

a. Public employers, their representatives or agents are prohibited from:
(1) Interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them by this act.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage employees in the exercise of the rights guaranteed to them by this act.

These subsections clearly apply to the holder of a position in the service of a public employer. However, the phrase "in regard to hire" would also appear to make it an unfair practice for public employers to discriminate with regard to initial hiring. Although we do not decide the jurisdictional question, we do hold that the fact-findings of the Commission were erroneous and demand reversal.

In the usual case, review of factual determinations of PERC is limited, and we would consider those findings binding on appeal when supported by adequate, substantial and credible evidence. *N.J.S.A.* 34:13A–5.4f (the statute uses the word "substantial"); see *In re Bridgewater Twp.*, 95 *N.J.* 235, 245–246 (1984). A reviewing court also gives "due regard" to the ability of the fact finder to judge credibility and, where the agency's expertise is a factor, to that expertise. *Mayflower Securities Co. v. Bureau of Securities*, 64 *N.J.* 85, 93 (1973). Of course, construction of a statute is a judicial, not an executive function. *Service Armament Co. v. Hyland*, 70 *N.J.* 550, 561 (1976). Hence, while due weight is to be accorded an agency's interpretation of a statute it is responsible for enforcing, such an interpretation is by no means conclusive. See *Peper v. Princeton University Board of Trustees*, 77 *N.J.* 55, 69–70 (1978); *Mayflower Securities Co. v. Bureau of Securities, supra*, 64 *N.J.* at 93; *In re Boardwalk Regency Casino*

*License App.,* 180 *N.J.Super.* 324, 333, (App.Div.1981), mod. 90 *N.J.* 361 (1982).

In *In re Bridgewater Tp., supra* our Supreme Court set forth guidelines for considering unfair practice charges brought by a public employee.[6] 95 *N.J.* at 240–244. It required that:

the employee must make a *prima facie* showing sufficient to support the inference that the protected union conduct was a motivating factor or a substantial factor in the employer's decision. Mere presence of anti-union animus is not enough. The employee must establish that the anti-union animus was a motivating force or a substantial reason for the employer's action. *Transportation Management, supra,* 462 *U.S.* at 401, 103 *S.Ct.* at 2474, 76 *L.Ed.*2d at 675. Once that *prima facie* case is established, however, the burden shifts to the employer to demonstrate by a preponderance of evidence that the same action would have taken place even in the absence of the protected activity. *Id.* This shifting of proof does not relieve the charging party of proving the elements of the violation but merely requires the employer to prove an affirmative defense. *Id.* (*Id.* at 242).

In the instant case PERC concluded that the charging parties had established a ·*prima facie* showing that their protected conduct was a "motivating factor or a substantial factor" in the College's decision not to hire them. PERC then considered that the burden was thus shifted to the College to prove by a preponderance of the evidence that they would not have hired the charging parties even if they had not engaged in any protected activity and held that the College had not met this burden.

As noted, the charging parties were required to make a *prima facie* showing that their protected activity was a substantial or motivating factor in the College's decision not to hire them. This required proof that the charging parties engaged in protected activity; that the College knew of this activity and

---

[6]The court adopted the test applied by the United States Supreme Court in *NLRB v. Transportation Management Corp.,* 462 *U.S.* 393, 103 *S.Ct.* 2469, 76 *L.Ed.*2d 667 (1983) which in turn had approved the so-called Wright-Line test applied by the NLRB in *Wright Line,* 251 *NLRB* 1083, 1084–85 (1980).

that the College was hostile toward protected rights. *In re Bridgewater Tp., supra* 95 *N.J.* at 246.

█ The College has never disputed that the charging parties engaged in protected activity. What was disputed was whether the College knew of the activity and whether it was hostile toward those protected rights. We are of the view that the charging parties clearly failed to meet their burden of proof as to these issues.

There was no statement elicited from McKeever and no proof that she ever told Riismandel that any individual was active in union organizing, including Alven, or that he knew who was involved in that activity. Riismandel testified that he had no knowledge of any specific persons being involved in any union activity. Indeed, although he did admit having general knowledge of union activity under the Johnson and Wales contract, he stated that this was of no concern to him.

Moreover, there was no testimony of any statements made by the charging parties or anyone associated with or acting on behalf of the College which would support a finding that the College was hostile toward the charging parties' exercise of protected rights. The single piece of tangible evidence upon which the charging parties relied to demonstrate the alleged hostility on the part of the College was the August 19, 1980 letter sent to the Army. While Riismandel admitted having knowledge of this letter, he said that he was not concerned with the content of the letter, but the fact that the sending of the letter constituted a breach of the chain of command. The charging parties failed to establish that the alleged anti-union animus was a "motivating factor or *substantial reason* for the employer's action." *In re Bridgewater, supra,* 95 *N.J.* at 242 (emphasis supplied).

█ Under the test enunciated in *In re Bridgewater,* once the employee has met its burden of proving knowledge and hostility on the part of the employer, the burden of proof shifts

to the employer "to demonstrate by a preponderance of the evidence that the same action would have taken place even in the absence of the protected activity." *Id.* We note that even if we assumed for the sake of argument that the charging parties had met their burden of proving knowledge and hostility, the record nevertheless reveals that the College demonstrated by a clear preponderance of the evidence that it would have denied employment to the charging parties irrespective of their protected activities. Among other things, the examples of grammatical errors not suitable for langauge or basic skills instructors, the serious attitude, character and personality problems, misrepresentation in a job application and the requests for higher pay scales than were being offered by the College made it obvious that the charging parties did not meet the College's criteria in determining qualified applicants. Even an unsupported statement that the person hired had fewer educational accomplishments than the person refused employment, if true, does not render the person hired unqualified. An employer can choose a person less qualified because of personal attributes or greater experience. *Kearny Generating Systems v. Roper,* 184 *N.J.Super.* 253, 261 (App.Div.1982). The reasons furnished by the College warranted their refusal to hire the charging parties. PERC's rejection of these reasons clearly was arbitrary, capricious and unreasonable.

We are called upon to decide under our standard of review whether the findings made could reasonably have been reached on sufficient, *In re Bridgewater Tp., supra,* 95 *N.J.* at 245–246, or "substantial," *N.J.S.A.* 34:13A–5.4f, credible evidence present in the record, considering the proofs as a whole. Our thorough review of the record in light of PERC's determination and the arguments in the briefs satisfies us that there was no evidence from which reasonable inferences could be drawn that the College's action constituted an unfair labor practice. We are satisfied that the evidence is wholly insufficient to establish

violations of any of the provisions of *N.J.S.A.* 34:13A–5.4 on behalf of the College or any of its agents or representatives.

We are thoroughly satisfied that PERC went so wide of the mark in its findings that a mistake must have been made. *State v. Johnson*, 42 *N.J.* 146, 162 (1964). We are convinced that the factual findings of PERC were so manifestly unsupported by and inconsistent with the competent, relevant and reasonably credible evidence that they offend the interests of justice and cannot stand. *Fagliarone v. North Bergen Tp.*, 78 *N.J.Super.* 154, 155 (App.Div.1963), certif. den. 40 *N.J.* 221 (1963); see *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). There is not only a clear distinction between ultimate and basic facts, but also a necessity that there be evidential support for the findings. *Smith v. E.T.L. Enterprises*, 155 *N.J.Super.* 343, 348 (App.Div.1978).

The testimony of the witnesses does not support the inferences drawn by the hearing examiner and PERC and are against the weight of the evidence. Although inferences can be drawn from established facts, what was done here was to draw inferences from the lack of proof. None of the witnesses were able to establish that the College or its personnel had knowledge of who the union organizers were or that the College's refusal to hire the charging parties was based on anti-union animus or because of any protected activity engaged in by the charging parties. The findings of PERC in that regard (which included those of the hearing examiner) were based on inference and speculation.

We emphasize that our role in reviewing PERC's findings is to determine whether those findings had been reached upon substantial evidence on the record as a whole. (See *N.J.S.A.* 34:13A–5.4) PERC's findings of fact were based neither upon substantial nor sufficient credible evidence in the record as a whole.

The determination of PERC is reversed.