IN THE MATTER OF TOWNSHIP OF BRIDGEWATER,
APPELLANT, AND BRIDGEWATER PUBLIC WORKS
ASSOCIATION, RESPONDENT.

Argued October 11, 1983—Decided February 2, 1984.

236

Daniel F. O'Connell argued the cause for appellant (Lanigan, O'Connell, Jacobs & Chazin, attorneys).

*Frederic M. Knapp* argued the cause for respondent Bridgewater Public Works Association (*Fox and Fox,* attorneys).

*Don Horowitz,* Deputy General Counsel, argued the cause for respondent Public Employment Relations Commission.

The opinion of the Court was delivered by

GARIBALDI, J.

The New Jersey Employer-Employee Relations Act (Act), *N.J.S.A.* 34:13A–1 to –21, makes unlawful a discharge or otherwise adverse public employer action against a worker because of his or her union activity. *N.J.S.A.* 34:13A–5.4 a(1) and (3). Public employers still retain the right, however, to discharge a worker for a legitimate business reason, unrelated to the employee's union activities. Here we examine the standard the Public Employment Relations Commission (PERC) is to apply to determine whether an unfair labor practice has been committed when dual motives, both an anti-union motive and a legitimate business motive, are asserted for a public employer's action.

I

The Township of Bridgewater hired Anthony Longo in October 1971. He originally worked in the Road Department as a mechanic but was transferred to the Parks and Recreation Department (Parks Department) in 1975. In June 1979 Cynthia Blodgett, the Parks Director, promoted Longo to Assistant Foreman. The Township created this position to give Longo a raise of $.33 per hour. The table of organization called for a foreman and six laborers to staff the Parks Department, but the foreman position was vacant and remained unfilled until January 1980.

In October 1979, the Township voluntarily recognized the Bridgewater Public Works Association (Association) as the exclusive representative of the employees of the Public Works Department and the Parks Department. Longo was one of approximately seven Township employees, and the only Parks Department employee, involved in the Association's organiza-

tion. In the latter part of 1979 and early 1980, Longo and other members of the Association's negotiation team met with Township officials to negotiate terms and conditions of employment.

These negotiations were continuing on March 5, 1980 when Blodgett called the Parks Department employees to a meeting. The Township claims the purpose of the meeting was to discuss changes in job descriptions and promotional opportunities for Parks Department employees. The Association alleges, however, that the purpose of the meeting was to suggest to the employees that they would be better off without the Association. Although the exact purpose of the meeting is disputed, it is uncontroverted that at the meeting each employee received an envelope containing a pay raise. Upon opening his envelope and finding a pay increase of $.10 per hour effective January 1, 1980, Longo interrupted Blodgett, protesting that the meeting was illegal absent an Association representative.

Immediately after the meeting the Parks Department employees contacted the President of the Association to protest Blodgett's actions at the March 5th meeting. At the Association's request, a meeting was held on March 7th; the meeting was attended by the Mayor, the Business Administrator, Blodgett and the Parks employees. At that meeting Blodgett defended her actions, stating that she had no intention of persuading the employees to leave the Association. She specifically asked two employees if she had requested that they leave the Association; both employees said no. Although Longo remained silent during the meeting, the Mayor testified that as he was leaving, Longo said "[t]hey [the employees] apparently had been intimidated" and "she's got them scared to death."

After the March 7th meeting, the President of the Association sent a memo to the Mayor apologizing for the embarrassment caused by the meeting, but expressing disbelief that all the employees of the Parks Department suddenly had changed their minds about Blodgett's purpose in calling the March 5th meeting.

The Township's "Employee Handbook" requires 30 day prior notice to an employee when his position is to be abolished. "Employee Handbook," Article II, ¶ 2.5. Nevertheless, on April 21, 1980, the Mayor and the Business Administrator summoned Longo to a meeting at which they informed him that the Township was abolishing the Assistant Foreman position effective the next day. Beginning that next day, Longo was transferred to the Road Department as an operator. His pay was reduced by $.25 per hour.

The Township asserted two reasons for Longo's transfer. First, there were "too many chiefs" in the Parks Department. Second, Longo could not get along with his supervisors, Parks Director Blodgett and Parks Superintendent Barack. Shortly after Longo left the Parks Department, the hiring of an additional laborer increased the work force to seven.

On June 6, 1980, the Association filed with PERC an unfair labor practice charge against the Township. The Association alleged that the Township had unlawfully demoted and transferred Anthony Longo from his position of Assistant Foreman of the Parks Department to the position of Operator in the Road Department in retaliation for Longo's protest of the unilateral wage increases offered at the March 5th meeting. The Association also argued that the action violated the Township's personnel guidelines.[1] The Township denied the charges. After a hearing, the PERC hearing examiner recommended dismissal of the unfair practice charge because (1) Blodgett's actions at the March 5 meeting did not violate the Act; hence, Longo's statement at the meeting was not an exercise of a protected union activity and (2) the Mayor exercised his managerial prerogative in transferring Longo. The Association filed exceptions to the hearing examiner's report.

[1]The Association also claimed that the Township had violated the Act by its unilateral withdrawal of permission previously given to employees to use Township facilities to work on their personal vehicles. This charge was rejected by PERC and not appealed by the Association.

PERC rejected the hearing examiner's report and held that the Township's transfer, demotion and reduction of Longo's salary was in reprisal for activity protected by the Act and thus violated *N.J.S.A.* 34:13A–5.4 a(1) and (3). PERC in its decision ordered that Longo's pay be increased by $.25 per hour, retroactive to his transfer in April, 1980. However, PERC did not order Longo's reinstatement as Assistant Foreman because Longo expressed no preference between his old and new jobs and because PERC found that the position of Assistant Foreman had been created merely to justify Longo's pay raise. PERC also denied the Township's motion for reconsideration of its decision. The Township then appealed to the Appellate Division, which affirmed PERC's decision, holding it was supported by substantial evidence and did not conflict with the Appellate Division's decision in *East Orange Pub. Library v. Taliaferro,* 180 *N.J.Super.* 155 (1981).

We granted the Township's petition for certification, 91 *N.J.* 547 (1982). We affirm the Appellate Division's judgment, granting PERC's motion for enforcement of its decision.

## II

The major issue here is whether, under the Act, *N.J.S.A.* 34:13A–1 to –21, PERC has adopted a proper test for resolving unfair labor practices in retaliation for an employee's exercise of protected union activity. In resolving this question, "the experiences and adjudications" under the Labor Management Relations Act (LMRA), 29 *U.S.C.A.* 141 to 187, are appropriate guides in determining unfair labor practices[2], because the language and intent of the Act and the LMRA are substantially the same. *Galloway Tp. Bd. of Educ. v. Galloway Tp. Ass'n of Educ.*

[2]However, we held in *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.,* 78 *N.J.* 144 (1978) that federal precedents concerning the scope of collective bargaining in the private sector are of little value in determining the permissible scope of collective bargaining in public employment labor relations in New Jersey.

*Sec.,* 78 *N.J.* 1, 9 (1978); *Lullo v. International Ass'n of Fire Fighters,* 55 *N.J.* 409, 424 (1970); *see also East Orange Pub. Library, supra,* 180 *N.J.Super.* at 160 (noting the comparability of *N.J.S.A.* 34:13A–5.4 a(3) and 29 *U.S.C.A.* 158(a)(3)). *Compare N.J.S.A.* 34:13A–5.4 a(1) and (3) *with* 29 *U.S.C.A.* 158(a)(1) and (3).

■   Under both the LMRA and the Act, if an employer fires an employee for having engaged in union activities, with no other basis for the discharge, the employer commits an unfair labor practice. Generally, however, an employer will assert that he has fired the employee for legitimate business reasons. An examination of the evidence may reveal that the asserted justification is a sham, or was not in fact relied upon. When this occurs, the reason advanced by the employer is deemed pretextual. Since no legitimate business reason exists, there is in fact no dual motive.

When dual motives are alleged, the National Labor Relations Board (NLRB) and the courts have a difficult time establishing the proper standard to evaluate whether the employer's actions result in an unfair labor practice. How are the competing reasons to be evaluated? Who has the burden of establishing each reason? What standard of proof should be required to establish the reasons?

For years the NLRB and the federal courts struggled to determine the proper tests to determine whether the LMRA has been violated in a dual motivation case. For a discussion of these various tests, see *Wright Line,* 251 NLRB 1083, 1984–85 (1980); *NLRB v. Transportation Management Corp.,* —— U.S. ——, ——, 103 *S.Ct.* 2469, 2473–74, 76 *L.Ed.2d* 667, 674–75 (1983). Finally in 1980, in *Wright Line,* 251 NLRB 1083 (1980), the NLRB adopted as its standard the test enunciated by the Supreme Court in *Mount Healthy City School District Bd. of Educ. v. Doyle,* 429 *U.S.* 274, 97 *S.Ct.* 568, 50 *L.Ed.2d* 471 (1977). In *Mt. Healthy* a school board refused to renew a teacher's contract for two reasons. First, the teacher had

informed a radio station of changes in school policy. That conduct was constitutionally protected. Second, the teacher used obscene language and gestures in the cafeteria, which conduct was not constitutionally protected.

The Court adopted a two-step test designed to distinguish between a result caused by a constitutional violation and one not so caused. The Court held that the employee bears the initial burden of showing that his activity was constitutionally protected and was a "substantial factor" or a "motivating factor" in the employer's action. *Mt. Healthy, supra,* 429 *U.S.* at 287, 97 *S.Ct.* at 576, 50 *L.Ed.*2d at 484. If this burden is met, then the employer must show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected activity. *Id.*

The Supreme Court in *NLRB v. Transportation Management Corp., supra,* approved NLRB's adoption of the *Mt. Healthy* test, designated in labor cases as the *Wright Line* test. Under that test, the employee must make a *prima facie* showing sufficient to support the inference that the protected union conduct was a motivating factor or a substantial factor in the employer's decision. Mere presence of anti-union animus is not enough. The employee must establish that the anti-union animus was a motivating force or a substantial reason for the employer's action. *Transportation Management, supra,* —— *U.S.* at ——, 103 *S.Ct.* at 2474, 76 *L.Ed.*2d at 675. Once that *prima facie* case is established, however, the burden shifts to the employer to demonstrate by a preponderance of evidence that the same action would have taken place even in the absence of the protected activity. *Id.* This shifting of proof does not relieve the charging party of proving the elements of the violation but merely requires the employer to prove an affirmative defense. *Id.* The Court held that the shifting burden standard in *Wright Line* did not impermissibly erode the requirement that the charging party bear the burden of proof by a preponderance of evidence because the elements of the unfair practice are unaffected by proofs that a legitimate reason for the activity may

have existed.[3]   In its decision, the Supreme Court reasoned that once the charging party established the elements of an unfair practice, the Board could have construed the Act to find an unfair practice even if the employer establishes an affirmative defense. *Id.* at ——, 103 *S.Ct.* at 2475, 76 *L.Ed.2d* at 676.   The use of the test, therefore, was reasonable. *Id.*   As the Court stated:

> The employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of illegal and legal motives cannot be separated because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing. [*Id.* at ——, 103 *S.Ct.* at 2475, 76 *L.Ed.2d* at 676.]

Other courts have held the *Wright Line* test is reasonable because it accommodates the legitimate conflicting interests inherent in the dual motivation cases. *See, e.g., NLRB v. Nevis Industries, Inc.,* 647 *F.2d* 905, 909 (9th Cir.1981).   It effectively weighs the interests of employees in union activity against the interest of the employer in operating his business as he sees fit. *Id.*   Moreover, it is reasonable because it is the employer who has best access to proof of his legitimate business reasons. *See NLRB v. Great Dane Trailers,* 388 *U.S.* 26, 36, 87 *S.Ct.* 1792, 1799, 18 *L.Ed.* 1027, 1035 (1967).   Nevertheless, it prevents imbalance in favor of the employee for it forecloses reinstatement of an employee when the employer would have taken action anyway but was motivated in part by anti-union animus.

Additionally, as the NLRB noted in *Wright Line,* the test eliminates the conceptual problems inherent in the blurred distinction of pretextual and dual motive cases if one views the employer's asserted justification as an affirmative defense. Many times the distinction between a dual motive case and a pretext case is difficult to discern.   "The perceived distinction, however, is more semantical than substantive" for the appropriate distinction cannot be made until after the presentation of all .

---

[3]We do not apply this test in cases involving à claim of gender discrimination in violation of *N.J.S.A.* 10:5–1 *et seq. Goodman v. London Metals Exchange, Inc.,* 86 *N.J.* 19 (1981).

the relevant evidence. *Lippincott Industries, Inc. v. NLRB,* 661
*F.*2d 112, 114–115 (9th Cir.1981). In either instance, the em-
ployer asserts legitimate business reasons for the discharge.

Therefore, the primary distinction between the two cases rests upon the differ-
ing weight that is attributed to the employer's explanation when examining the
motivations behind a discharge. Of course, this determination is made after the
evidence is presented. [*Id.*]

"Thus in a pretext situation, the employer's affirmative de-
fense of business justification is wholly without merit. If,
however, the affirmative defense has at least some merit, a dual
motive may exist and the issue becomes one of the sufficiency of
proof necessary for the employer's affirmative defense to be
sustained." *Wright Line, supra,* 251 NLRB at 1084 n. 5.

### III

In New Jersey, PERC has adopted the *Wright Line* test in
determining whether an unfair labor practice has been commit-
ted when dual motives are asserted for an employer's action. In
*East Orange Pub. Library, supra,* 180 *N.J.Super.* at 163,
the Appellate Division approved PERC's use of the *Wright Line*
test, holding that an employee must establish that the protected
activity was "a substantial, *i.e.,* a motivating factor" in the
employer's disputed action. Once this is accomplished, the bur-
den shifts to the employer to "go forward and establish by a
preponderance of the evidence" that the action occurred for
legitimate business reasons and not in retaliation for the pro-
tected activity. *Id.* As the Appellate Division noted, ultimately
the conflicting proofs will be for the fact finder to resolve. *Id.*

The scope of our review of PERC's interpretation of the Act is
limited. We have held that an administrative agency's interpre-
tation of a statute that it is charged with enforcing is entitled to
due deference. *In re Application of Saddle River,* 71 *N.J.* 14, 24
(1976). In *State v. Professional Ass'n of N.J., Dept. of Educ.,* 64
*N.J.* 231, 258–59 (1974), we set forth the standard for review
of PERC's decision in a representation proceeding under *N.J.S.A.*
34:13A–6d as follows:

The role of judicial review in that record is thoroughly settled. The administrative determination will stand unless it is clearly demonstrated to be arbitrary or capricious, *Flanagan v. Civil Service Dept.,* 29 *N.J.* 1, 12 (1959). This is the same rule as applies to judicial review of bargaining unit determinations by the National Labor Relations Board. *Packard Motor Co. v. National Labor Relations Board,* supra, (330 *U.S.* 485, 67 *S.Ct.* 789, 91 *L.Ed.* 1040). Moreover, where, as here, a substantial element of agency expertise is implicated, due weight should be accorded thereto to judicial review. [citation omitted.]

■ Applying this test of judicial review here, we find PERC's interpretation of the Act, which resulted in its adoption of the *Wright Line* test, to be reasonable. Moreover, we are persuaded that the *Wright Line* approach is the best test yet established for determining causation in dual motive cases. We agree with the Appellate Division in *East Orange Pub. Library* that the "approach is sound, balanced and fair to both sides." *East Orange Pub. Library, supra,* 180 *N.J.Super.* at 163. Further, we perceive no reason, and none was offered by the Township, to apply a different standard in the public sector in New Jersey from that in the private sector. We do believe placing the burden on an employer to assert an affirmative defense is not so onerous as to interfere with proper governmental functions. The standard does not unduly restrict government operations. Instead, it presents a fair balance between municipal and state employees' rights to unionize and to practice protected union activities, and the municipal and state employers' right to manage and operate their municipality or state agency.

## IV

■ The scope of our review of PERC's factual determination likewise is limited. The evaluation of the evidence is a task assigned to PERC, not to us. *See In re Tenure Hearing of Grossman,* 127 *N.J.Super.* 13, 23 (App.Div.), certif. den., 65 *N.J.* 292 (1974). When, as in this case, those determinations fall within the agency's special sphere of expertise, we accord them due weight. In *Goodman v. London Metals Exchange, Inc.,* 86 *N.J.* 19, 28 (1981), we held:

Judicial appellate review of an administrative agency's factual determinations is circumscribed. If there is sufficient credible competent evidence to support those conclusions, the appellate tribunal must uphold those findings. * * * Justice Francis, in *Weston v. State,* 60 *N.J.* 36 (1972), observed that "in the final analysis for a court to sustain an administrative decision, which affects the substantial rights of a party, there must be a residuum of legal and competent evidence in the record to support it." *Id.* at 51. Our scope of review is even more limited. We must ask whether the Appellate Division correctly applied the rule. If it did, then the question is whether the Appellate Division was right or wrong in sustaining the findings. When both the agency and the Appellate Division have made the same findings, we ordinarily would affirm unless both were clearly in error. See *State v. Johnson,* 42 *N.J.* 146, 163 (1964) (citations omitted.)

Although a *de novo* review of this record might have led to different factual findings, it is clear, as the Appellate Division concluded, that PERC's findings of fact were supported by sufficient, credible, competent evidence in the record.

■ Under the *Wright Line* test, in the absence of any direct evidence of anti-union motivation for disciplinary action, a *prima facie* case must be established by showing that the employee engaged in protected activity, that the employer knew of this activity, and that the employer was hostile toward the exercise of the protected rights. *In re Gattoni,* 6 *N.J.* PERC ¶ 11227 at 443, 444 (1980). Applying that test here, PERC determined that Longo established that he had engaged in a protected activity, and that the Township knew of such activity and was hostile to his exercise of such activity.

It was uncontradicted that although the Township was negotiating with the Association about wage increases, Parks Director Blodgett offered wage increases to employees at the March 5th meeting without negotiating with an Association representative. PERC determined that the Parks Director's granting of wage increases without negotiating with the Association representative was an improper action. As the United States Supreme Court stated in *NLRB v. Exchange Parts Co.,* 375 *U.S.* 405, 409, 84 *S.Ct.* 457, 460, 11 *L.Ed.*2d 435, 439 (1964):

The danger inherent in well-timed increases in benefits is the suggestions of a fist inside the velvet glove. Employees are not likely to miss the inference that

the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.

Thus, the Supreme Court held that it is a violation of the essential principle of collective bargaining to allow an employer to negotiate directly with individual employees concerning wages, hours, and working conditions, and to disregard the representative of those employees. PERC properly held that Longo's protest at the March 5th meeting was a protected action within the meaning of the Act.

Further, it is uncontroverted that the Township knew of Longo's protected action. The record discloses that the Township knew of Longo's active role in organizing the Association, particularly the Parks Department employees, his protest at the March 5th meeting, and his continuing belief that the March 5th meeting constituted an improper action by the Parks Director.

PERC held that the following facts were sufficient to establish the Township's hostility toward Longo's union activities: Longo's transfer, so soon after his March 5th protest and his recent promotion; the absence of any written complaints about his employment; and the failure of the Township to follow its own written procedures and give Longo thirty days written notice of the elimination of his position and his transfer.

■ Thus, we conclude there is sufficient and credible evidence to support PERC's position that the Association established a *prima facie* case that a motivating factor in Longo's transfer was the Township's reprisal for his protected union activity. Further, we find that once the Association's *prima facie* case was established, PERC reasonably held that the *Wright Line* test shifted the burden to the Township to demonstrate that the transfer was for legitimate business reasons.

The Township offered two reasons for Longo's demotion and transfer. The first reason was, as the Mayor testified, that there were "too many chiefs" in the department and not enough laborers, and that work was not getting done. The second reason was that Longo could not get along with his supervisors, Parks Director Blodgett and Parks Superintendent Barack. PERC determined that both these reasons were merely pretextual and did not constitute legitimate business justifications. Although a *de novo* review of the record might have

led us to different factual findings, we conclude, as did the Appellate Division, that PERC's findings are supported by sufficient credible evidence in the record.

The record shows that ten months before Longo's demotion, the position of Assistant Foreman had been created to give him a salary increase. Four months elapsed from the time a foreman was hired until Longo's transfer. As PERC fairly noted, "[i]f indeed a controlling reason for the job change was that there were too many superiors and not enough laborers, it would seem as though this would have surfaced before four months had elapsed." In addition, the passage of four months suggests that time was not of the essence. Accordingly, Longo should have received the requisite thirty days written notice. Moreover, within a month of Longo's transfer, the Parks Department hired a new laborer, an action that suggests the department needed seven men. Finally, the Parks Director testified that one reason for the March 5th meeting was to consider creating promotional steps within the department so employees could move up, a plan certainly contrary to an expressed concern that there were "too many chiefs" in the department.

PERC found that the Township's alleged second reason, *i.e.*, that Longo could not get along with his supervisors, likewise was pretextual. The Township never alleged Longo's job performance was bad, but merely that he had a history of uncooperativeness with his superiors. There were no written complaints against Longo; indeed, an earlier Parks Director had recommended his promotion, and one of the supervisors he allegedly could not get along with, Parks Director Blodgett, had promoted him only ten months before his transfer. In fact, she had created the position of assistant foreman so Longo could get the pay raise the Township thought he deserved. Moreover, at the hearing the Township admitted that it had Longo help train the new supervisor. Certainly, these actions are inconsistent with the perception of an employee unable to get along with his superiors.

■ The Township did present evidence of Longo's inability to get along with his supervisors. At the hearing, the Mayor, the Business Administrator, who had over-all responsibility for the performance of the work force and Parks Director Blodgett

all testified about Longo's uncooperativeness. The hearing examiner refused to permit additional evidence to the same effect and the Township claims that was error. However, the hearing examiner did not abuse his discretion in refusing to hear cumulative evidence on this point.

PERC did not ignore the evidence presented to support the Township's assertion that Longo could not get along with his supervisors. Rather, after weighing the evidence, PERC found the Township's reasons to be pretextual because they were decisively contradicted by the absence of written complaints against Longo, the June 1979 promotion and raise that Blodgett, one of the supervisors he allegedly could not cooperate with, gave him, and the failure of the Township to follow its own written personnel procedures.

Further, we conclude a remand in this case to permit the Township to offer further evidence concerning Longo's inability to get along with his superiors or fellow workers would serve no purpose. Longo complained that he was improperly deprived of his position in the Parks Department when the Township transferred him to the Road Department. The PERC decision leaves him in the Road Department. Moreover, the Township has not argued or contended that his rate of compensation is not warranted. Therefore, prolonging the proceeding would serve no purpose.

We therefore hold that PERC's conclusion was not arbitrary, was supported by substantial credible evidence, and was affected insignificantly, if at all, by the absence of the testimony that the hearing examiner excluded.

V

To summarize, we hold PERC's adoption of the *Wright Line* test to determine whether an unfair labor practice has been committed when both an anti-union motive and a legitimate business motive are asserted for an employer's action is permissible under the Act and that PERC properly applied the test. PERC's allocation of the burden of proof was reasonable and its conclusion that the Township's proffered reasons were pretextual was supported by sufficient credible evidence.

Accordingly, we affirm the judgment below.

O'HERN, J., dissenting.

I agree with the principles of law stated by the majority. I disagree with the application of those principles to the facts of this case.

The respondent's member, Anthony Longo, was a troublesome, disruptive employee of Bridgewater Township whose temper tantrums led him on occasion to threaten his fellow workers. The Mayor of Bridgewater transferred Longo to the Road Department, instead of firing him as he later wished he had. When the Mayor told Longo of this decision, Longo, after telling the Mayor that his old supervisor was a "jerk" and that the Mayor "better learn what you're doing in this job," said of his new supervisor, "I'm going to bust his head open. I'll kill him. Don't let him near me. I hate him. I'll kill him." Yet, because Longo was a union activist, the effect of the Court's decision is that he cannot be disciplined for conduct that would be unforgivable in the case of another employee. "The result [is] to immunize union activists against legitimate discipline for genuine offenses and to deprive employers of the freedom to apply their own rules uniformly to all their employees." *NLRB v. Wright Line*, 662 *F.*2d 899, 902 (1st Cir.1981), *cert.* denied, 455 *U.S.* 989, 102 *S.Ct.* 1612, 71 *L.Ed.*2d 848 (1982). This unfortunate result arises because the Court refuses to permit the matter to be remanded to the hearing examiner to hear the direct evidence bearing upon Longo's job performance.

One of the problems with the case is that the hearing examiner and the Public Employment Relations Commission (PERC) had differing views of the legal posture of the case. In the view of the hearing examiner, the issue was whether the municipality exercised an "inherent managerial prerogative" in transferring Longo, relying upon *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144 (1978), a case prohibiting arbitration of such a dispute. He therefore apparently concluded that it was unnecessary to consider the municipality's offer of proof that Longo was an unruly, disruptive employee who would have been transferred regardless of his union activity. At the hearing, the examiner refused to permit the Director of Recreation and Parks to testify about Longo's performance, including evidence of the direct threats of physical harm to his superiors, absent the "original source of these complaints." In the examiner's view,

[y]ou know really I don't have any concern at this point over what the performance of Mr. Longo was. I mean, the question was—the question before me is whether or not when Mr. Longo was transferred in April and reduced in rate, whether or not that was in retaliation for the exercise by him with respect to accepting and protecting rights. I don't have any question of his performance before me. This isn't an issue.

On review of the hearing examiner's report, PERC correctly concluded that agency review of an exercise of managerial discretion is permitted to determine whether the employment decision has been illegally motivated. *See Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n,* 94 *N.J.* 9 (1983).

In my view, the agency should then have remanded the matter to the examiner to hear and evaluate the proofs, particularly the credibility of the proffered witnesses. We have repeatedly stressed the agency's right to insist that a hearing officer consider all evidence relevant to the agency's decision. *See In re Kallen,* 92 *N.J.* 14 (1983) (license revocation case remanded to Administrative Law Judge to hear additional evidence on drunk driving offered by police). The correlative of this is a duty to consider the relevant evidence that parties offer.

It may be easier to decide cases without hearing all the evidence but it is not fair. In *Murphy v. Division of Pensions,* 117 *N.J.Super.* 206, 218 (App.Div.1971), Judge Conford emphasized that "the rejection of [physicians'] reports by the Commission in its decision, without giving the claimant an opportunity to offer the oral testimony of the physician, is obviously unfair under the circumstances." This is especially so here when, after the hearing examiner has restricted a line of questioning, the agency relies upon the lack of evidence of poor performance in concluding that the transfer was motivated by an anti-union bias. That the Township had not maintained a file of complaints should not make a difference. We should not be the ones to encourage government by dossier.

Our cases have emphasized the important role that the hearing officer has in the agency decision. In *Goodman v. London Metals Exchange, Inc.,* 86 *N.J.* 19, 34 (1981), in reviewing a finding of gender bias, the Court emphasized that "[d]eferring to the examiner's opportunity to observe the witnesses' demeanor, weigh the employer's proffered explanation and fix its sufficiency and credibility, we find that the record is replete with evidence supporting the factual determinations made by the hearing examiner."

To the same effect is *NLRB v. Wright Line,* 662 *F.*2d at 909:

Further support for the Board's conclusion as to Wright Line's motivation comes from the [administrative law judge's (ALJ)] credibility judgments. To rebut the inference of improper motive, Wright Line presented the testimony of three of the officials involved in the discharge. Each related his own view of the incident, denying any concern for [the union member's] "untrustworthiness," as shown by his false time report. The ALJ stated that, from the demeanor of the witnesses as well as from "the record as a whole ... I do not believe that they were truthful in revealing the 'real reason' for [the union member's] discharge." ... The ALJ's credibility judgments must stand unless they are unreasonable, which these are not.

I regret dragging this personnel matter on any longer but think that the municipality should have a fair chance to show that this employee received no more and no less than any other employee would have. The hearing examiner should hear the Township out and fix the sufficiency and credibility of its explanation.

I would reverse and remand the cause to consider the issue of poor performance.

Justice CLIFFORD joins in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices SCHREIBER, HANDLER, POLLOCK and GARIBALDI—5.

*For reversal and remandment*—Justices CLIFFORD and O'HERN—2.