NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0765-14T2

IN THE MATTER OF BOARD OF FIRE
COMMISSIONERS, FIRE DISTRICT NO.
1, MONROE TOWNSHIP and MONROE
TOWNSHIP PROFESSIONAL FIREFIGHTERS
ASSOCIATION, INTERNATIONAL
ASSOCIATION OF FIREFIGHTERS,
LOCAL 3170.

_____

> **APPROVED FOR PUBLICATION**
>
> **December 8, 2015**
>
> **APPELLATE DIVISION**

Argued October 26, 2015 — Decided December 8, 2015

Before Judges Lihotz, Fasciale and Nugent.

On appeal from the Public Employment
Relations Commission.

Jonathan F. Cohen argued the cause for
appellant Board of Fire Commissioners, Fire
District No. 1, Monroe Township (Apruzzese,
McDermott, Mastro & Murphy, P.C., attorneys;
James L. Plosia, Jr., of counsel and on the
brief; Mr. Cohen, on the brief).

Daniel J. Zirrith argued the cause for
respondent Monroe Township Professional
Firefighters Association, International
Association of Firefighters, Local 3170 (Law
Offices of Daniel J. Zirrith, L.L.C.,
attorneys; Mr. Zirrith, of counsel and on
the brief).

Frank C. Kanther, Deputy General Counsel,
argued the cause for respondent New Jersey
Public Employment Relations Commission (Don
Horowitz, Acting General Counsel, attorney;
Mr. Horowitz, on the statement in lieu of
brief).

The opinion of the court was delivered by

FASCIALE, J.A.D.

Monroe Township (the Township) Board of Fire Commissioners, District No. 1 (the Board), appeals from a September 18, 2014 final agency decision by the Public Employment Relations Commission (PERC) sustaining unfair practice charges filed by the Monroe Township Professional Firefighters Association, International Association of Firefighters, Local 3170 (Local 3170), alleging that the Board violated the New Jersey Employer-Employee Relations Act (the Act), N.J.S.A. 34:13A-1 to -43.

Local 3170 argued the Board retaliated by firing full-time firefighters in District No. 1, after it lodged the unfair labor practice charges. The Board maintained the discontinuation of full-time firefighters in favor of using volunteers was designed to save taxpayer money for the Township. Applying the dual motivation test set forth by our Supreme Court in In re Township of Bridgewater, 95 N.J. 235 (1984), PERC upheld the findings of a hearing examiner, who determined that anti-union animus was a substantial or motivating factor for the termination. PERC rejected as pretextual the Board's assertion that it fired the firefighters as a cost saving measure.

On appeal, the Board again asserts its managerial action fell within its right to assure fiscal responsibility.

Accordingly, the Board contends PERC had no authority to review the matter, and even if it did, it overstepped its remedial authority.

We affirm PERC's determination and conclude PERC did not overstep its remedial authority by requiring the Board to offer to reinstate the terminated employees with substantially the same work hours, responsibilities, and benefits. We hold, however, that a public employer retains its rights under the Act after it reinstates an aggrieved employee "to discharge a worker for a legitimate business reason, unrelated to the employee's union activities." Twp. of Bridgewater, supra, 95 N.J. at 237. The reinstatement of an aggrieved employee, therefore, does not forever preclude the public employer from making legitimate and non-retaliatory employment decisions.

## I.

The Act authorizes municipalities to create fire districts, each to be run by a five-member board of fire commissioners. There are three fire districts in the Township. The Board is the public employer for Fire District No. 1. Local 3170 represents all Township paid firefighters and is an employee labor organization within the meaning of the Act.

By 1999, the Board had hired three full-time firefighters in District No. 1: Michael Mangeri, David Shapter, and Joseph

3                                                    A-0765-14T2

Calella. In 2007, the Board added a per diem firefighter to comply with a regulation requiring that four firefighters battle certain fires. Calella later resigned due to a disability, and the Board replaced him with a per diem firefighter rather than a full-time, permanent career firefighter. Thereafter, the paid firefighting force in District No. 1 consisted of four firefighters: two full-time and two per diem. The per diem firefighters were not members of Local 3170.

In March 2008, James Grande, the president of Local 3170, attended a Board meeting and requested that the Board fill Calella's vacant full-time firefighter paid position. Although Commissioner Joseph Leatherwood stated the Board was not interested in filling the vacancy with a third full-time firefighter, President Grande pursued the request by engaging in informal discussions with various Board members on the subject. In June 2008, Board Chairman Charles DiPierro and Volunteer Chief Lonnie Pipero met with Grande, Mangeri, and Shapter and informed them that the Board had deliberated on the matter and had decided that it would not fill the vacant position.

Local 3170 retained counsel, who wrote a letter to the Board advising it to cease from violating the Act and the Open Public Meetings Act, N.J.S.A. 10:4-6 to -21. Counsel requested

that the Board deal exclusively with Local 3170 as to filling the full-time paid vacancy. Chairman DiPierro responded:

> The Board did not appreciate receiving [the] letter [from Local 3170's attorney] and that it was looking into the possibility of eliminating the career [firefighting] staff.

He also said that any future actions taken by the union's attorney would not help getting the third firefighter position filled.

In July 2008, Local 3170's counsel wrote to the Board expressing a desire to negotiate rather than litigate, but cautioned that Local 3170 might be left with no alternative other than filing unfair practice charges under the Act. The Board did not respond.

On October 13, 2008, Local 3170's counsel sent another letter reiterating its position. The Board, through counsel, arranged a meeting with Local 3170 members. The Board's counsel and Commissioners DiPierro and Perry attended on behalf of the Board and agreed to hire a third firefighter. The Board also invited Local 3170 members to attend the next Board meeting on November 19, 2008. The Board's counsel and DiPierro did not attend that meeting, at which Commissioner Robert LeBrun stated that the Board "had no intention of hiring a third permanent firefighter[,]" and that Local 3170 could "[g]o ahead and sue us, do what you have to do."

On November 20, 2008, Shapter talked to DiPierro, who advised that "the [Board] w[as] considering getting rid of all of the paid career staff so that they were not going to add a third career firefighter." On December 5, 2008, DiPierro also stated if the union president and attorney "[k]eep pushing issues with the hiring of the third man, the Board is thinking of pushing the union out of the station up to the other end of town." On December 28, 2008, without any explanation by the Board, Mangeri learned that another individual would be assuming his payroll functions.

On January 13, 2009, counsel for Local 3170 informed the Board that unless the parties resolved their dispute, it would file "an unfair practice charge and grievance alleging that the Board has violated the Act and the parties' agreement by filling bargaining unit positions with part[-]time[,] non-unit members and threatening unit members for their exercise of rights guaranteed under the Act . . . ."

On February 19, 2009, the Board continued threatening the future of the paid firefighting staff. For example, while Shapter, DiPierro, and a per diem firefighter were at the firehouse, another volunteer firefighter commented that the television set was taken away and that "they got rid of the mail . . . ." DiPierro stated "there[ are] going to be a lot more

changes and this is the beginning of the end."  The comment was corroborated by the per diem firefighter.

On March 23, 2009, Local 3170 charged the Board with violating sections 5.4a(1), (3), and (5) of the Act, which provide in pertinent part:

> a.    Public    employers,    their representatives  or  agents  are  prohibited from:
>
> (1)  Interfering  with,  restraining  or coercing  employees  in  the  exercise  of  the rights guaranteed to them by this act.
>
> . . . .
>
> (3) Discriminating in regard to hire or tenure  of  employment  or  any  term  or condition  of  employment  to  encourage  or discourage  employees  in  the  exercise  of  the rights guaranteed to them by this act.
>
> . . . .
>
> (5) Refusing to negotiate in good faith with  a  majority  representative  of  employees in  an  appropriate  unit  concerning  terms  and conditions  of  employment  of  employees  in that unit, or refusing to process grievances presented by the majority representative.

Local 3170 specifically alleged that the Board violated the Act "by  unilaterally  assigning  bargaining  unit  work  to  non-bargaining  employees  and  retaliating  against  Local  3170  through threats and intimidation."  Local 3170 further asserted that the Board  "took  retaliatory  action  toward[s]  Local  3170  and

A-0765-14T2

threatened to dissolve the paid career staff if Local 3170 continued to assert its rights under the Act."

On May 8, 2009, for the first time since full-time firefighters were hired, the weekday paid—firefighter shift was covered by volunteer firefighters. On May 22, 2009, DiPierro stated to Shapter that "your union and career [staff] are putting up a wall between the [Board]." DiPierro continued, stating "[t]his is not good for your future here . . . you know that your contract is up December 31, [2009] and that might be it." A per diem firefighter corroborated that DiPierro made these statements "in a threatening and demeaning tone."

At this time, Mangeri was working light duty because of an injury. On May 29, 2009, the day after the Board and Local 3170 members attended an exploratory conference held by PERC, the Board eliminated Mangeri's light-duty eligibility status, indicating that he could return to work after he was cleared by the Board's health care provider. On June 17, 2009, the Board passed a resolution repealing the Township's light-duty policy.

On December 16, 2009, before a regularly scheduled Board meeting, Volunteer Deputy Fire Chief Scott Kivet overheard Commissioner Vincent Dilieto and Chief Pipero discussing the termination of the paid firefighting staff. Commissioner Dilieto suggested "it might be done tonight" and Chief Pipero

told Kivet "nothing [would] stop it." Dissolution of the paid firefighting staff, however, was not discussed at the Board meeting.

On December 29, 2009, the parties met to negotiate a new firefighting services contract. Local 3170 made its proposals, which DiPierro and Commissioner Michael Costello advised would be presented to the Board. On January 14, 2010, DiPierro requested that Mangeri bring the 2009 firehouse logbook to the Board meeting scheduled for January 20, 2010. Three days later, he also directed Mangeri to "forward all programs and passwords on all [firehouse] computers to the Board."

On January 20, 2010, the Board approved District No. 1's 2010 budget. The Board stated during the meeting that "no reduction in force [was] reflected in the budget and . . . money to compensate the career firefighters and per diem firefighters was included in the 2010 budget." DiPierro reassured those in attendance that "money for paid staff was in the budget" and it was "the Board's intention . . . to provide fire protection with career staff, volunteers[,] and mutual aid." Commissioner LeBrun also spoke, noting there was nothing "on the agenda to dissolve the career staff."

The next day, DiPierro contacted Mangeri and Shapter and instructed them to keep a more detailed logbook. On February 1,

2010, Mangeri contacted DiPierro and Costello to schedule a second contract negotiation session. The parties never met again to discuss a successor agreement.

The Board held its next scheduled meeting on February 17, 2010. Two days prior, it posted a notice informing the public the Board would "consider personnel matters" at the meeting and that "[o]fficial action may be taken . . . ." At the meeting, the Board passed a resolution (4-0) dissolving the full-time paid firefighting staff in District No. 1.[1] The resolution stated, in pertinent part:

> WHEREAS; the Board has determined . . . the costs of maintaining full-time paid firefighters to supplement the fire protection services provided by [District No. 1's] highly[-]skilled and dedicated volunteer firefighters exceed the benefits derived and is economically burdensome and unwarranted in these times of severe economic hardship and distress; and
>
> WHEREAS; Termination of the full[-]time paid staff will result in substantial cost savings to [District No. 1] and will enable [District No. 1] to reduce its budget and thereby result in a lower fire district tax rate.

On March 16, 2010, Local 3170 amended its unfair practice charge, providing "specific examples of retaliatory acts by the Board and alleging . . . the retaliation intensified since the

---

[1] Commissioner Perry abstained from voting.

filing of the [original] charge, culminating in the termination of the full[-]time firefighting career staff."

The Board denied the charges, maintaining that it acted within its discretion to dissolve the paid fire department. The Board contended that it did so as a cost saving measure, rather than in retaliation for Local 3170's undisputed protected activity.

The hearing examiner, who conducted hearings on seventeen days over twenty-three months, issued a comprehensive seventy-nine page opinion, and concluded that the Board violated the Act.

Regarding violations of N.J.S.A. 34:13A-5.4(a)(1) and (5), the hearing examiner concluded that the Board failed to negotiate in good faith to fill the third, full-time, paid firefighting position. The hearing examiner found the firefighters' interests "in preserving the weekday, daytime firefighting duties for themselves," outweighed the Board's motive "to operate the paid shift at a reduced cost," without reorganizing or changing the way it delivered fire services to District No. 1 during the day. Citing City of Jersey City v. Jersey City Police Officers Benevolent Association, 154 N.J. 555, 580-81 (1998), the hearing examiner concluded this activity was "mandatorily negotiable" and could not be performed without

affording "the union . . . an opportunity to negotiate an acceptable alternative, one that would not result in job loss and [a] reduction in union membership."

Regarding violations of N.J.S.A. 34:13A-5.4(3) and (4), the hearing examiner concluded Local 3170 proved "by a preponderance of the evidence [i]n the record that protected conduct was a substantial or motivating factor in the Board's decision to dissolve the paid fire department." The hearing examiner found Mangeri and Shapter, individually and through Local 3170 president Grande, requested, on multiple occasions, that the Board fill the third firefighter position with a full-time career firefighter instead of using per diem firefighters. These requests began in 2008 and continued until 2010.

The hearing examiner found that the Board acted with hostility. We quote at length from pertinent parts of the hearing examiner's findings setting forth the substantial credible evidence of retaliation and anti-union animus:

> It was undisputed by the parties that prior to 2008 there was labor peace in Fire District [No.] 1. During that time, the parties had a friendly working relationship and cooperatively worked together to resolve issues as they arose. Their relationship began to deteriorate when Local 3170's attorney began writing to the Board and pressing the issue of filling the third firefighter position with a full-time employee who would be a member of the bargaining unit. As early as July 16, 2008,

. . . the Board read to the public a letter it had received the previous day from counsel to Local 3170 regarding the filling of the vacant position. After the meeting, Chairman DiPierro warned President Grande that more letters from the Local's attorney would only aggravate the situation and could lead to the elimination of the paid staff.

The day after Shapter attended the November 19, 2008 Board executive session where Commissioner LeBrun remarked, "go ahead and sue us, do what you have to do," [Chairman] DiPierro advised Shapter that the Board was considering getting rid of all of the paid firefighters. About two weeks later on December 5th, DiPierro further cautioned Shapter that if the union kept pushing the issue of hiring a third full-time firefighter, the Board will push "the union out of the station up to the other end of town."

On January 1, 2009, payroll duty was taken away from Mangeri without explanation. He was informed of the change via email instead of personally by a Board liaison as had been done in the past.

On January 13, 2009, Local 3170's attorney apprised the Board that it would be filing an unfair practice charge if it did not cease using non-bargaining unit employees to perform bargaining unit work. A month later, on February 19[, 2009], Chairman DiPierro warned . . . Shapter that "this is the beginning of the end."

The Board's hostility and acts of retaliation intensified and escalated after Local 3170 filed its unfair practice charge . . . . Setting a tone, [Chairman] DiPierro stopped visiting the firehouse as often and ceased eating lunch with the paid firefighters.

A-0765-14T2

On May 8, 2009, while Mangeri was on light[-]duty assignment and Shapter was off from work, the Board operated the day shift exclusively with volunteer firefighters. It was the first time since the establishment of the paid force that the weekday, day shift was covered by volunteers. Also, in May 2009, the Board became less responsive and more exacting in approving requested time-off by the firefighters. Sometime before May 20, 2009, the Board took away scheduling duties from Mangeri and Shapter. They were not given an explanation as to why the duties were assigned to a secretary and no one from the Board informed them of the change. The secretary told them.

President Grande and . . . Shapter attended the May 20[, 2009] meeting of the Board. During the public portion of the meeting, Grande asked the Board why no paid staff was used on May 8[] and why the scheduling duties were taken away from Mangeri and Shapter. Two days later, on May 22[, 2009 Chairman] DiPierro told Shapter . . . "[y]our union and career [staff] are putting a wall between the [Board]" and warned him that[] "[t]his is not good for your future here . . . you know that your contract is up [o]n December 31, [2009] and that might be it." [Chairman] DiPierro exhibited further hostility toward Local 3170 by rhetorically asking Shapter, "[w]ho is he to question the Board," referring to union President Grande.

On May 28, 2009, the Board expended resources in defending itself against Local 3170's unfair practice charge by attending an exploratory conference at the [Commission] office in Trenton. The next day, Mangeri was informed that he could no longer work light[-]duty assignments effective June 1[, 2009] and . . . if he had any questions he should call the Board attorney. Mangeri was given no explanation

14

for that decision and was abruptly pulled from projects he was working on while on light duty. Two weeks later, on June 17[, 2009], the Board rescinded the light[-]duty policy which was enacted only the year prior. Though Local 3170 was included in the process of developing the policy, it received no notice from the Board that it was going to be rescinded.

Sometime in late June, the secretary to the Board informed Mangeri and Shapter that effective July 1, 2009, the Board will eliminate the fourth firefighter on the day shift. No explanation was provided. The reasons that gave rise to the Board adding the fourth firefighter had not changed or diminished.

At the one and only negotiations session for a new contract[,] held on December 29, 2009, as a precondition to negotiating, Commissioner Costello demanded that the union justify why the Board should continue employing paid firefighters. Even Chairman DiPierro (who was there) testified that Costello's comment made everyone uncomfortable. At that session, the Board did not make any proposals nor did it respond to the proposals presented by Local 3170.

The Board did not pay the firefighters their longevity or inspector's stipend in January 2010[,] as required under the contract and past practice. The Board ignored numerous requests for payment made by Mangeri and Grande, and did not pay the firefighters until three months after they had been terminated in June 2010. Also, in January 2010, the Board added thirteen new requirements to keeping the logbooks following a particularly well-attended Board meeting in which the public demanded that the paid firefighters be retained.

. . . .

> The last and ultimate act of retaliation by the Board was terminating the paid firefighters eleven months after their union had filed an unfair practice charge with [the Commission]. [Chairman] DiPierro's comments on [E]lection [D]ay regarding the firefighters' wage proposal in negotiations (citing it as the reason for their termination) are revealing. Though they were made after the decision to eliminate the firefighters, the remarks demonstrate a disposition hostile to participating with unions in the give[-]and[-]take process required by collective negotiations.

The hearing examiner also rejected as pretextual the Board's justification for dissolving the paid full-time fire department because of "hard economic times" and a "desire[] to pass along the cost savings to the taxpayers . . . in the form of tax relief."

> The Board provided insufficient evidence [that] . . . the taxpayers of Fire District [No.] 1 were losing their properties and/or jobs in unprecedented, record numbers. The Board itself consistently carried a budget surplus of over $1,000,000 per year, which trended upwards in the years relevant to this case (2008-2010). The Board's accountant admitted . . . the Board was never in financial distress. There were no "times of severe economic hardship and distress" established on the record.

> The taxpaying[-]public's sentiment to keep a daytime paid force was clear to the Board. Those taxpayers who spoke at the January 20, 2010 Board meeting made it

16

clear. If the Board had any doubt about what the taxpayers of District [No.] 1 desired after the meeting because those who spoke were not representative of the taxpayers at large, that doubt was removed when the 2010 budget was approved by the voters on February 17, 2010. The 2010 budget included money to pay the full-time and per diem firefighters for another year. It is specious for the Board to claim that economic hardship drove its decision.

If economics were of such a concern, one must wonder why the Board decided to terminate the firefighters only a few days before it would know whether or not the budget passed and therefore know whether or not it had the money to continue to retain them. In a similar vein, once the Board knew the budget passed, there was no doubt what the citizenry desired or what District [No. 1] could afford, yet the Board did not rescind the resolution terminating the firefighters.

The Board's proffered motive of reducing taxes is equally unbelievable. Firstly, the Board knew there would be no tax relief in 2010 because the tax rate for that year was already set based upon a budget that included compensation for the paid firefighters. Secondly, it offered to pay Fire District [No.] 3 substantially the same amount of money for fire protection in 2010 as the cost of retaining its own paid force. Thirdly, the Board in fact spent most of the savings derived from terminating the paid firefighters on a new vehicle for the Fire Chief and radios. The Board did not act as though it was trying to pass the savings onto the taxpayers of the fire district. Its behavior does not support a finding that reducing taxes was a genuine motive behind eliminating the paid fire force.

A-0765-14T2

I also find the Board's reasons to be pretextual because it never once mentioned the possibility of dissolving the paid department because of financial concerns to Grande, Mangeri[,] or Shapter. The parties communicated on a number of issues throughout 2009. The subject did not even come up as late as December 29, 2009[,] when the parties had a contract negotiations session which lasted about an hour and a half.

Neither Local 3170, Mangeri[,] nor Shapter were given any notice of the Board's decision to terminate them. The first that they learned that they would be no longer employed because of financial reasons was the public reading of the resolution terminating them. The abruptness and lack of transparency surrounding their termination erodes the credibility of the Board's proffered reasons.

Even the Board's treatment of Mangeri and Shapter after it terminated them illustrates that the decision was predicated upon hostility and ill-will rather than unbiased business considerations. During the two weeks Mangeri and Shapter were still working at the firehouse before their termination became effective, only Commissioner Perry spoke to them. Mangeri and Shapter were not treated by the Board as employees customarily . . . who are severed due to economic reasons as opposed to performance issues. They were not given an exit interview or advised of their post-employment [Consolidated Omnibus Budget Reconciliation Act] rights, nor were they informed on where to return keys, uniforms[,] and equipment.

As a result of the overwhelming evidence establishing the Board's violation of the Act, the hearing examiner ordered the Board to post a notice, which provided in pertinent part:

> WE WILL offer to reinstate Firefighters Michael Mangeri and David Shapter who were terminated effective March 5, 2010, with substantially the same hours of work and employment responsibilities as they had immediately prior to their termination.
>
> WE WILL make the terminated employees who accept offers of reinstatement whole for all salary and benefits due from March 5, 2010 to the present, less mitigation, with interest at the rate set by Court rules.
>
> WE WILL in the event the Board determines to use at least three (3) firefighters on the weekday, day shift, negotiate in good faith with Local 3170 over the filling of the third paid firefighter position.

The Board appealed to PERC contending the hearing examiner erred by (1) determining that it terminated paid firefighters in retaliation for charges brought by Local 3170, and (2) concluding that its proffered reason, i.e., to cut costs, was pretextual.

On September 18, 2014, PERC adopted the hearing examiner's findings of fact concluding that the Board violated <u>N.J.S.A.</u> 34:13A-5.4(1), (3), (4), and (5). PERC rejected the Board's argument that the hearing examiner's finding of anti-union animus was unsupported by the facts, noting the hearing

examiner's conclusion was largely "based upon credibility determinations of the witnesses, [which] include[d] both direct and circumstantial evidence of hostility to protected activity." PERC also rejected the Board's financial-hardship defense, agreeing with the hearing examiner's conclusion that it was pretextual "as the Fire District, based on the Board's own witness and accountant, had never been in financial distress."

In addition to the mandated posting, PERC required the Board to take the following remedial steps: "[o]ffer to reinstate" Mangeri and Shapter "with substantially the same hours of work and employment responsibilities as they had immediately prior to their termination"; make Mangeri and Shapter whole, if they accept the offers, "for all salary and benefits due from March 5, 2010 to the present, less mitigation, with interest at the rate set by Court rules"; and negotiate with Local 3170 in good faith for the placement of a third paid firefighter if "the Board determines to use at least three . . . firefighters on the weekday, day shift[.]"

On appeal, the Board argues (1) PERC and the hearing examiner erred by rejecting as pretextual its cost savings defense and concluding that the Local 3170 charges were a substantial or motivating factor in terminating the paid firefighters; (2) PERC erroneously substituted its judgment for

that of the Board; and (3) PERC overstepped its remedial authority, implying at oral argument before us that the Board should not be required to indefinitely employ the reinstated employees.

## II.

The scope of our review of PERC's interpretation of the Act, the statute it is charged with enforcing, is limited. "In the absence of constitutional concerns or countervailing expressions of legislative intent, we apply a deferential standard of review to determinations made by PERC." Jersey City Police Officers Benevolent Ass'n, supra, 154 N.J. at 567. PERC's determination must be upheld unless the party appealing it shows that it is clearly arbitrary and capricious. Id. at 568. As to PERC's findings of fact, our review is similarly circumscribed; so long as there is sufficient credible evidence to support its conclusions, we must uphold PERC's findings. Twp. of Bridgewater, supra, 95 N.J. at 245-46. Here, the Board has not shown that PERC's decision is arbitrary and capricious.

We begin by addressing the Board's contention that PERC and the hearing examiner erred by rejecting as pretextual its cost savings defense and concluding that the Local 3170 charges were a substantial or motivating factor in terminating the paid firefighters. The Board primarily argues that Chairman

DiPierro's anti-union animus was not shared by the rest of the Board members, and that DiPierro acted on his own behalf, rather than on behalf of the Board.

Pursuant to the Act, it is "unlawful [to] discharge or otherwise [take an] adverse public employer action against a worker because of his or her union activity." Twp. of Bridgewater, supra, 95 N.J. at 237 (citing N.J.S.A. 34:13A-5.4(a)(1) and (3)). "Public employers still retain the right, however, to discharge a worker for a legitimate business reason, unrelated to the employee's union activities." Ibid.

Our Supreme Court has explained that under the Act, there are two types of cases. First, there are "pretext" cases in which "an employer fires an employee for having engaged in union activities, with no other basis for the discharge[.]" Id. at 241. In such cases, it is clear from the evidence "that the asserted justification is a sham, or was not in fact relied upon[,]" and therefore, "[s]ince no legitimate business reason exists, there is in fact no dual motive." Ibid. In pretext cases, the employer's affirmative defense of legitimate business justification is deemed to be "wholly without merit." Id. at 244 (citation and internal quotation marks omitted).

The second kind of case is dual motive. In Township of Bridgewater, the Court set forth the framework for analyzing

dual motive retaliation cases. The Court explained that when dual motives are alleged,

> the employee must make a prima facie showing sufficient to support the inference that the protected union conduct was a motivating factor or a substantial factor in the employer's decision. Mere presence of anti-union animus is not enough. The employee must establish that the anti-union animus was a motivating force or a substantial reason for the employer's action. Once that prima facie case is established, however, the burden shifts to the employer to demonstrate by a preponderance of evidence that the same action would have taken place even in the absence of the protected activity. This shifting of proof does not relieve the charging party of proving the elements of the violation but merely requires the employer to prove an affirmative defense.

> [Id. at 242 (citations omitted).]

While often a fine line, the distinction between pretext cases and dual motive "cases rests upon the differing weight that is attributed to the employer's explanation when examining the motivations behind a discharge." Id. at 244 (citation and internal quotation marks omitted). Where an "affirmative defense has at least some merit, a dual motive may exist and the issue becomes one of the sufficiency of proof necessary for the

A-0765-14T2

employer's affirmative defense to be sustained."[2]    Ibid.
(citation and internal quotation marks omitted).

Here, the hearing examiner determined that this was a dual motive case that warranted application of the Township of Bridgewater framework.  The Board concedes that the Township of Bridgewater framework applies, but argues that PERC erred in applying the test to the facts of this case.  We see no merit to that contention and conclude that there was no error in the hearing examiner's findings of fact and conclusions of law.

A substantial inference of anti-union animus pervaded Board activity during the relevant timeframes.  DiPierro's disparaging comments were made in his capacity as Chairman of the Board.  He told Grande, that "the Board . . . was looking into the possibility of eliminating the career staff."  DiPierro reiterated a similar threat to Shapter, telling him "if the union kept pushing the issue of hiring a third full-time firefighter, the Board w[ould] push 'the union out of the

---

[2]    We note that this matter could have been analyzed as a pretext case, given the Board's baseless cost savings defense and strong anti-union animus.  However, because the parties have agreed that the dual motive framework, set forth in Township of Bridgewater, applies, and because we reach the same result under either approach, we analyze the issues under the dual motive rubric, as did the hearing examiner and PERC.  Our opinion, however, should not be construed as agreeing or disagreeing with the threshold determination that this is a dual motive case.

station up to the other end of town.'" The Board acted without notice or input from Local 3170, repealed the light[-]duty policy, and stripped Mangeri from the administrative duties he had performed since 2004. The approval of requested time-off and longevity payouts were also delayed with little to no explanation by the Board.

Moreover, the Board has not met its "burden to demonstrate that the same action would have taken place even in the absence of the protected conduct." Comite Organizador de Trabajadores Agricolas (COTA) v. Molinelli, 114 N.J. 87, 101 (1989) (citation and internal quotation marks omitted). The Board suggests, DiPierro's comments aside, three Board members sought to pursue tax savings by using volunteer firefighters in District No. 1. We reject the Board's contention that the other voting commissioners did not share DiPierro's anti-union animus when they terminated Mangeri and Shapter.[3] There is substantial credible evidence in the record supporting the conclusion that the Board's proffered business reason for terminating the full-

---

[3] In the discrimination context, applying a similar burden-shifting framework, we have held that "discriminatory comments made by one with input into the decision-making process are not stray remarks." Grasso v. W. N.Y. Bd. of Educ., 364 N.J. Super. 109, 118 (App. Div. 2003) (citing Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001)).

time paid firefighters was pretextual. The hearing examiner

stated in pertinent part that

> [a]ccording to the Board's own witness and accountant, . . . Fire District [No.] 1 has never been in financial distress. The surplus for budget year 2008 was $1,070,960. The surplus as of December 31, 2009 was $1,405,781, up almost $335,000. The total assessed property valuation in District [No.] 1 went up about $18,000,000 from 2008 to 2009 and increased another $3,000,000 from 2009 to 2010. The proposed fire tax rate in District [No.] 1 for 2010 was $.139, down from $.16 from the preceding year (2009). Among the three Fire Districts in Monroe Township, District [No.] 1 consistently had the lowest fire tax rate before the creation of, during[,] and after the elimination of the part[-]paid fire department.
>
> The 2010 budget approved by the voters included $210,000 for salary and wages for the two career firefighters and two per diems. When factoring in the money also budgeted for benefits and considering that some of the money was spent for a small portion of the year, there was still over $200,000 in savings that could be used to reduce taxes in future budget years.
>
> The following budget year, 2011, the Board purchased a new vehicle for the Fire Chief costing $70,000 and new radios for $90,000. It also purchased a new brush truck for $140,000 with voter approval. Even with those purchases, the Board was able to reduce the tax rate by $.03 for 2011 by using its reserves which had been increased by the money saved from eliminating the paid firefighters. If the Board had[ not] made the purchases, it could have passed on even greater tax savings to

its residents by using that money to further reduce the tax rate.

Here, the record does not support the Board's argument that serious economic considerations existed at the time the Board dissolved its full-time paid firefighting staff. Our Supreme Court has explained that "once a discharged employee makes out a prima facie case of anti-union animus, the employer has the burden of linking the timing of the discharges closely with economic decline." Id. at 102. District No. 1 operated under a large surplus during the years leading up to 2010, and earmarked money in its 2010 budget specifically for Mangeri's and Shapter's salaries. Once the career firefighters were terminated, the Board exhibited no commitment to fiscal responsibility, purchasing expensive radios and a new $70,000 vehicle for the Fire Chief. Further, the Board did not replace its career firefighters with volunteers for 2010, its main contention for saving taxpayer money. Rather, it contracted with District No. 3 to provide its weekday, day fire services for an equivalent amount earmarked in the 2010 budget to compensate the full-time paid staff.

Finally, the Board's reliance on Borough of Keyport v. International Union of Operating Engineers, Local 68, 222 N.J. 314 (2015) is misplaced. In Borough of Keyport, the municipalities provided detailed financial information evincing

27

a financial crisis. Id. at 320-26. For instance, in one municipality there existed a surplus of only $6,000 and the municipality "faced increased healthcare, pension, and labor costs without an increase in tax revenues." Id. at 321. District No. 1, however, maintained a surplus of well over $1,000,000 in 2008, which increased by approximately $350,000 the following year. Property values in the Township also rose during the same timeframe. Further, each of the municipalities in Borough of Keyport submitted layoff plans to PERC for its approval. Id. at 321, 324, 326. Here, the Board did not.

There was no credible evidence of anti-union animus in Borough of Keyport. The issue, as addressed by the Supreme Court, focused on whether the parties were obligated to negotiate the tangible employment decisions made prior to their implementation. Here, the Board does not challenge that portion of PERC's decision. As the Supreme Court pointed out, "an artificial 'fiscal crisis' cannot outweigh important employee work and welfare interests." Id. at 346.

III.

Next, the Board maintains that it alone has the authority to establish and regulate fire districts, including whether services are provided by paid, part-paid, or volunteer firefighters. Contrary to its contention, PERC did not usurp or

otherwise supplant the Board's statutorily prescribed authority to regulate District No. 1's fire department.

As PERC properly noted, many of the "cases cited by the Board . . . pre-date the Act and do not involve improper or illegal motives for personnel actions." The Board misconstrues two fundamentally different issues. The Board is correct that under N.J.S.A. 40A:14-81.1(a),

> [t]he commissioners of any fire district may, by resolution, establish paid positions within the fire department, or for the fire district, as such position shall be determined by the commissioners to be required for the purposes of the fire district. The commissioners shall, by resolution, appoint persons to, determine the terms of, fix the compensation for, and prescribe the powers, functions and duties of all paid positions so established.

Moreover, under N.J.S.A. 40A:14-70.1(b), "[t]he board of fire commissioners of a fire district not having a paid or part-paid fire department and force may contract with a volunteer fire company or companies for the purpose of extinguishing fires, upon those terms and conditions as shall be deemed proper." However, recognizing that the fire commissioners have such power, it does not follow that they are thereby granted the ability to engage in unlawful retaliation to protected union activity.

Empowered by the Legislature, PERC is explicitly authorized to regulate the tangible employment decisions made by a public employer. See N.J.S.A. 34:13A-5.2 (granting PERC remedial authority to "make policy and establish rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration including enforcement of statutory provisions"). Nothing in PERC's findings or conclusions prevented the Board from lawfully regulating District No. 1's fire department, including how it chooses to provide fire services and whether or not its firefighters should be compensated. Simply put, the Board's ability to govern the structure of the fire district and make personnel decisions does not, in and of itself, insulate the Board from liability or allow it to act in a retaliatory and unlawful manner. PERC acting under its statutory authority to enforce the Act is not a usurpation of the Board's authority.

IV.

We reject the Board's final challenge that PERC abused its discretion by ordering the Board to take affirmative steps to offer Mangeri and Shapter reinstatement as firefighters with back pay and benefits and, in the event the Board determines to use at least three firefighters, to negotiate in good faith with Local 3170.

A-0765-14T2

Contrary to the Board's contention, the remedy of reinstating employees wrongfully discharged under the Act has been upheld under PERC's broad remedial authority. See Galloway Twp. Bd. of Educ. v. Galloway Twp. Ass'n of Ed. Sec'ys, 78 N.J. 1 (1978). In Galloway Township, the Supreme Court held that the authority to order reinstatement and back pay to an aggrieved claimant "is necessarily subsumed within the broad remedial authority the Legislature has entrusted to PERC." Id. at 9-10; see also Maywood Bd. of Ed. v. Maywood Ed. Ass'n, 168 N.J. Super. 45, 63 (App. Div.), certif. denied, 81 N.J. 292 (1979).

The Legislature has empowered PERC with "broad authority and wide discretion" based on the agency's expertise and knowledge in this "highly specialized area of public life." In re Hunterdon Cnty. Bd. of Chosen Freeholders, 116 N.J. 322, 328 (1989). We conclude there was no abuse of that authority as to the remedial remedy imposed by PERC. Certainly, its decision does not preclude the Board from taking any future action, including termination, for legitimate, non-retaliatory reasons.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION