**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0032-21

IN THE MATTERS OF VICTORIA
ALBERTO, DANIEL ANTINORI,
MATTHEW BARTLETT, GARY
BENDIT, FRANK CANEJA,
JACEK DEMCZUK,
ALEXANDER ECHEVARRIA,
PETER FLANNERY, JUSTIN
GARCIA, MICHAEL
MARCINIAK, VINCENT MAYO,
WILLIAM MCMONIGLE,
JEREMIAH NAYDA, JOSEPH
PRIDE, BRUCE REED, RONALD
SALZANO, WENDY TINIO,
CHRISTOPHER TINIO, DARIO
VARGAS, and BERGEN COUNTY
SHERIFF'S OFFICE.

_____

Argued November 29, 2023 – Decided December 26, 2023

Before Judges Sabatino and Mawla.

On appeal from the New Jersey Civil Service Commission, Docket No. 2017-3992.

Michael A. Bukosky argued the cause for appellants (Loccke, Correia, & Bukosky, LLC, attorneys; Michael A. Bukosky, of counsel and on the briefs).

Adam W. Marshall, Deputy Attorney General, argued the cause for respondent New Jersey Civil Service Commission (Matthew J. Platkin, Attorney General, attorney; Eric A. Reid, Deputy Attorney General, on the statement in lieu of brief).

Brian M. Hak argued the cause for respondent Bergen County Sheriff's Office (Eric M. Bernstein & Associates, LLC, attorneys; Eric M. Bernstein, of counsel and on the brief; Brian M. Hak, on the brief.)

PER CURIAM

This is the third of a series of appeals from the Civil Service Commission ("CSC") by numerous former Bergen County police officers who were the subject of a 2017 layoff plan implemented by the Bergen County Sheriff's Office ("BCSO"). In essence, the appellants presently contend the CSC erred in upholding a decision of an administrative law judge ("ALJ"), who ruled against their claims after a multi-witness hearing.

For the reasons that follow, we affirm the CSC's final agency decision dated July 21, 2021, without prejudice to one or more of the appellants filing a complaint in a trial court pursuing their claims that respondents improperly revoked a settlement offer in the wake of the ALJ's ruling.

A-0032-21

In the interests of brevity, we incorporate by reference the facts and procedural history detailed at length in our previous opinions of April 18, 2019[1] and June 29, 2020.[2] The parties are familiar with the extensive background of this dispute, and we need not repeat it here. The following abbreviated summary will suffice for our purposes.

The layoff plan was prompted by the Judiciary's statewide directive to increase the presence of security officers in courthouses. The plan involved disbanding the Bergen County Police Department ("BCPD") and adding more officers to the BCSO. County officials maintained that all or many of the BCPD police officers lacked the qualifications to be assigned to the courthouse, and the BCSO consequently needed to hire new officers to fulfill those courthouse assignments. Further, the officials asserted the County could not afford keeping the former BCPD officers on the payroll, so the County adopted a layoff plan.

---

[1] In re Layoffs of Bergen Cty. Sheriff's Dep't v. Bergen Cty. Sheriff's Office, Nos. A-4103-16, A-4516-16 (App. Div. Apr. 18, 2019) ("BCPD Layoffs I") (deeming moot the CSC's denial of a stay of the layoff plan (A-4103-16) and affirming a Chancery Division order dismissing an action filed to enjoin the BCSO from implementing the layoff plan (A-4516-16)).

[2] In re Brundage, No. A-3466-17 (App. Div. Jun. 29, 2020) ("BCPD Layoffs II") (affirming the CSC's determinations concerning the laid-off officers' displacement claims and rejecting their labor union's contention that their roles in the Bergen County Police Department were identical to those of the officers in the BCSO).

A-0032-21

The officers' labor union, the Police Benevolent Association, Local 49 ("the PBA"), as well as various individual officers, challenged the layoffs. At one point, the County entered into a settlement with the PBA that involved paying $20,000 in exchange for a release to each officer who opted into the settlement. Several officers accepted that settlement offer on a rolling basis. However, the County rescinded the settlement offer following the ALJ's rejection of their layoff challenge.

In the first appeal, BCPD Layoffs I, the PBA sought to stay the CSC's approval of the layoff plan and enjoin its implementation. In our April 18, 2019 unpublished opinion, we deemed the appeal moot because by that time the BCSO had already carried out the layoff plan and the CSC had issued a decision delineating the rights of the laid-off officers.

In the second appeal, BCPD Layoffs II, we issued an unpublished opinion on June 29, 2020, affirming the CSC's determination of the alleged displacement rights of the County police officers. Among other things, our opinion upheld the CSC's conclusion that the two occupational titles in the BCPD and the BCSO were sufficiently dissimilar and therefore the County police officers had no lateral rights to the Sheriff's Officer positions.

4

The present appeal concerns a so-called "Bridgewater" challenge to the layoff plan, in which the former officers seek to invalidate the layoffs as allegedly motivated by anti-union animus and other improper motives. See Matter of Bridgewater Twp., 95 N.J. 235 (1984). Appellants contend that Michael Saudino, the Bergen County Sheriff who implemented the layoffs, made anti-union and other improper remarks that exhibited such improper motives.

The Bridgewater dispute was referred to the Office of Administrative Law for fact-finding as a contested case. An ALJ heard testimony from several union leaders and police officers about incidents in which they contended Saudino displayed bias. Saudino testified for the BCSO. Saudino acknowledged he had made statements critical of the union and various officials involved in negotiating the layoffs, but explained that he did so in understandable frustration because the union allegedly would not cooperate with him in carrying out the layoff plan that the CSC and this court had already approved.

After hearing the testimony, the ALJ issued a twenty-four-page decision on June 3, 2021, concluding that the challengers had failed to meet their burden under Bridgewater to prove that the layoffs were implemented in bad faith. In particular, the ALJ found:

I moreover CONCLUDE that petitioners have <u>not</u> met their burden under <u>Bridgewater</u>, and that retaliation for union activity was <u>not</u> a motivating force or substantial reason for the layoff and demotion of these officers.

[(Emphasis added).]

With respect to Sheriff Saudino, the ALJ made these pertinent findings:

Petitioners' claims in this regard are squarely directed at Saudino. But the elimination of the County Police was <u>an agenda that predated Saudino's tenure</u> as Sheriff. <u>And Saudino made every effort to effectuate that agenda without being forced to lay off the subject officers</u>. The untoward comments attributed to him <u>do not demonstrate that he was looking to destroy the union</u>; only that he was frustrated that the union would not or could not work with him toward a compromise that would save jobs.

[(Emphasis added).]

The ALJ further rejected the petitioners' contention that Saudino carried out the layoffs in retaliation against the union because of a so-called "poison pill" grievance provision the union had previously negotiated:

Nor did petitioners demonstrate that Saudino laid off County Police officers to retaliate for union activity, most specifically for filing the "poison pill" grievance. Abolishment of the County Police, or their subsumption into the Sheriff's office, was on everyone's mind, the County and Local 49 alike, as early as 2014, well before the layoff. This is clearly why the "poison pill" provision was negotiated by the PBA; to discourage such a merger. And the beginnings of the layoff were

6

embedded in the Agreement for realignment that was executed in 2015. That document made it clear that eliminating the redundancy in services created by maintaining a county police force was its long-term goal. By using the term "realignment" the [Collective Negotiations] Agreement reflected an attempt to evade the contract provision that would increase salaries upon a merger. To me, this validates Saudino's contention that saving police jobs was top of mind; hence the initial attempt to reduce force via attrition, and the attempt to avoid an additional financial burden that might make reduction of force by attrition unrealistic.

Once the PBA sought to invoke the "poison pill," Saudino authorized his attorneys to pursue the legal avenues available to restrain arbitration; this was his right, and not an indicator of anti-union animus. And it was surely possible that the additional moneys paid to the County Police under the controverted contractual provision would have added to the financial exigencies that forced the layoff. From this vantage point, there is a nexus between the grievance and the layoff. But neither the filing of the "poison pill" grievance, nor the ultimate arbitration award upholding the grievance, were what motivated the layoff. Indeed, the arbitrator's award upholding the grievance did not come until 2019, some two years after the layoff took place. I CONCLUDE that retaliation for union activity, specifically the filing of the "poison pill" grievance, was not the force that motivated this layoff.

[(Emphasis added).]

Based on these and other findings we need not repeat here, the ALJ reiterated at the end of her decision:

A-0032-21

> In summary, I CONCLUDE that petitioners have failed to meet their burden under N.J.A.C. 4A:8-2.6(c) and <u>have not demonstrated that this layoff was implemented in bad faith</u>.
>
> [(Emphasis added.)]

In essence, the ALJ determined that legitimate budgetary and staffing constraints, not improper bias, motivated the challenged layoffs.

The CSC upheld the ALJ's decision in its July 2021 two-page final agency decision, following what it described as "an independent evaluation of the record." This appeal ensued.

On appeal, the affected BCPD officers essentially argue: (1) the ALJ and the CSC misapplied the <u>Bridgewater</u> standard of bad faith; (2) the court should enforce the settlement that the County rescinded; and (3) the ALJ and CSC ignored the officers' arguments of promissory estoppel and First Amendment associational claims.[3]

As we recognized in our previous opinions in this long-running dispute, our scope of review of the CSC's final agency decision is limited. Appellate review of administrative agency decisions is generally restricted to:

> (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action

---

[3] We have reordered and restated appellants' arguments for purposes of our discussion.

violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[George Harms Constr. Co. v. N.J. Turnpike Auth., 137 N.J. 8, 27 (1994).]

A "strong presumption of reasonableness" attaches to the CSC's decision as an administrative action. Matter of Vey, 272 N.J. Super. 199, 205 (App. Div. 1993), aff'd, 135 N.J. 306 (1994). "If there is substantial evidence on the whole record to support the Commission's judgment, it is our duty to affirm." Amodio v. Civ. Serv. Comm'n, 81 N.J. Super. 22, 30 (App. Div. 1963). "When resolution of a legal question turns on factual issues within the special province of an administrative agency, those mixed questions of law and fact are to be resolved based on the agency's fact finding." Campbell v. New Jersey Racing Comm'n, 169 N.J. 579, 588 (2001).

Apart from these general principles of deference to an administrative agency's expertise, we also must afford substantial deference to the ALJ's factual findings and credibility assessments, which the CSC here adopted. A key aspect of this appeal centers on the ALJ's conclusions regarding the intent behind the layoffs. Those findings by the trier of fact about intent, based on an appraisal

of the live witness testimony, must be upheld if they are supported by substantial evidence in the record. Judson v. Peoples Bank & Tr. Co. of Westfield, 17 N.J. 67, 76 (1954) (recognizing "[t]he telltale factor of demeanor in the presence of the trier of fact" and its frequent "vital importance").

With these principles of appellate review in mind, we turn to the issues raised on appeal. We begin with appellants' argument that the ALJ and the CSC misapplied the Bridgewater standard of bad faith.

The Civil Service Act provides that "a permanent employee may be laid off for economy, efficiency or other related reason." N.J.S.A. 11A:8-1(a). Before doing so, the public employer, referred to in the relevant provisions as the "appointing authority," must attempt to "lessen the possibility, extent or impact of layoffs by implementing pre-layoff actions" including, but not limited to, initiating temporary hiring or promotion freezes; terminating temporary employees; returning provisional employees to their permanent titles; reassigning employees; and/or assisting potentially affected employees to find other employment. N.J.S.A. 11A:8-2(a); N.J.A.C. 4A:8-1.2. The employer must also meet with the majority representative of the potentially affected employees and obtain the approval of the Chairperson of the CSC prior to implementing such measures. N.J.S.A. 11A:8-2(b); N.J.A.C. 4A:8-1.2 to -1.3.

If the employer deems individual or mass layoffs necessary, it must submit a detailed layoff plan to the CSC at least thirty days before notifying any potentially affected employees. N.J.A.C. 4A:8-1.4(a). The CSC will then approve the plan or direct the employer to take additional alternative measures, provide additional information, or change the plan as necessary. N.J.A.C. 4A:8-1.4(d).

If the CSC approves the plan, the employer must notify the affected employees at least forty-five days in advance of their termination. N.J.S.A. 11A:8-1(a); N.J.A.C. 4A:8-1.6(a). The employer must also provide the CSC with "a list of the names and permanent titles of all employees receiving the notice." N.J.S.A. 11A:8-1(a). The CSC ensures the list's compliance with N.J.S.A. 11A:8-1(b), which requires that employees in State or local service "shall be laid off in inverse order of seniority." See also N.J.A.C. 4A:8-1.1(b); N.J.A.C. 4A:8-2.2; N.J.A.C. 4A:8-2.4. The CSC also determines whether any listed employee has "lateral [or] demotional title rights" that would allow him or her to remain employed by "bumping" a less senior employee, and/or "reemployment rights" to be placed on a list to be rehired later on. N.J.S.A. 11A:8-1(f), (h); N.J.A.C. 4A:8-1.1(b); N.J.A.C. 4A:8-2.1; N.J.A.C. 4A:8-2.3. These determinations are made prior to the effective date of the layoff, and the

CSC then assumes responsibility for sending its final notices to the affected employees.  N.J.A.C. 4A:8-1.1; N.J.A.C. 4A:8-1.6(f).

Pertinent here, layoffs in furtherance of "economy or efficiency" must further a "good faith" effort to do so "in the public interest."  Prosecutor's Detectives and Investigators Ass'n of Essex Cnty. v. Bd. of Freeholders, 130 N.J. Super. 30, 43 (App. Div. 1974) ("Prosecutor's Association of Essex County").  Terminated employees may challenge the good faith basis of the layoff by proving, by a preponderance of the evidence, that the stated reasons for the layoffs were a pretext for an improper removal not truly related to economy or efficiency.  N.J.S.A. 11A:8-4; Glab v. Borough of Belmar, 92 N.J.A.R.2d (CSV) 377, 379 (1992); see also Matter of Polk, 90 N.J. 550, 560 (1982) (noting New Jersey law "has long recognized that the usual burden of proof for establishing claims before state agencies in contested administrative adjudications is a fair preponderance of the evidence").  If the layoffs are found to have been motivated by bad faith, the employee may be awarded "[b]ack pay, benefits and counsel fees . . . ."  N.J.A.C. 4A:2-1.5.

The Supreme Court elaborated upon these principles concerning bad faith and improper motive in Bridgewater, explaining that such prohibited intent may be established with: (1) "direct evidence of anti-union motivation for

disciplinary action," or (2) "a prima facie case . . . by showing that the employee engaged in protected activity, that the employer knew of this activity, and that the employer was hostile toward the exercise of the protected rights."  95 N.J. at 246.  See also In re Hunterdon Cnty. Bd. of Chosen Freeholders, 116 N.J. 322, 335 (1989) (reiterating and applying these standards).  "Once that prima facie case is established, however, the burden shifts to the employer to demonstrate by a preponderance of evidence that the same action would have taken place even in the absence of the protected activity."  Bridgewater, 95 N.J. at 242.

Appellants claim to have established Saudino's motives were "directly and clearly motivated by anti-union animus."  They argue Saudino "simply replaced petitioners he considered 'terrorists' who created 'union nightmares' for him with other persons he considered 'cheaper' for racially and gender discriminatory motivations."

Based on the testimony and exhibits presented to her, the ALJ had sufficient grounds to reject these contentions.  Applying the Bridgewater standards, the ALJ found appellants failed to shift the burden to the BCSO to justify the layoffs as non-pretextual because, as we quoted her above, "the elimination of the [BCPD] was an agenda that predated Saudino's tenure as Sheriff" and also because "[t]he untoward comments attributed to him do not

13

demonstrate that he was looking to destroy the union; only that he was frustrated that the union would not or could not work with him toward a compromise that would save jobs."

The ALJ's assessment of the timing of Saudino's role is supported by the record. Saudino became Sheriff of Bergen County on January 1, 2011. Within two months, a study commissioned by the County Board of Freeholders was published that found the contemplated reorganization of the BCPD and BCSO would not negatively impact emergency response functions. In 2013, the Board passed Ordinance 13-27 to amend the County's administrative code to facilitate the mandated reorganization. The BCPD became a bureau under the sheriff on January 1, 2015, through an agreement between the county executive, Saudino, and the county prosecutor to effectuate the 2013 county ordinance directing the consolidation.[4] Saudino testified that "[m]erging the county police into the sheriff, I can tell you, when I was hired in 1973, it was spoke of and there [were] several studies that were done and to my best knowledge, every study indicated

---

[4] As the ALJ noted, that agreement imposed pressure on Saudino to decrease the BCSO's personnel. Section 2.4 stated "to effectuate the public purpose behind this Realignment, that being the elimination of redundancies and the reduction of costs and expenses associated with operating the BCPD," the BCSO must reduce its personnel from 255 to 201 police officers through attrition. That provision imposed a hiring freeze and expressly encouraged additional cuts.

A-0032-21

that yes, this [merger] should take place." In essence, by the time Saudino had assumed the position of Sheriff, the policy decision to merge had long been in process.

Appellants contend they disproved the layoffs were motivated by good-faith required increases in court security staffing, because the then-PBA President testified that the number of court security officers had actually decreased from fifty-one to forty-three in the years following the layoffs. However, the ALJ rejected this testimony as lacking an adequate foundation for the witness's knowledge, and in light of the "constant[]" retirements and new hires of BCSO personnel. The ALJ also credited Saudino's countering testimony that the charts proffered by the PBA President showing alleged staffing decreases in the BCSO from 2017 to 2018 were misleading, because they failed to account for daily fluctuations in assignments.

Moreover, it has long been recognized that even if a reduction rather than an increase in courthouse staffing within the BCSO after the layoffs occurred, the assessment of a public employer's good faith depends on the information available when the layoff plan is designed, not retrospectively. City of Newark v. Civ. Serv. Comm'n, 112 N.J.L. 571, 574 (1934) stated:

> The question, as we view it, is, not narrowly whether a
> plan conceived and adopted for the purpose of saving

A-0032-21

money actually, in operation, attained its purpose, but whether the design in adopting the plan was to accomplish economy or, on the contrary, was to effect the removal of a public employee, protected by civil service, without following the statutory procedure . . . .

Appellants further contend Saudino wrongfully carried out the layoffs in retaliation for a PBA grievance that had been filed to obtain salary increases. Before the layoffs occurred, the collective negotiations agreement ("CNA") between Bergen County and its police officers was amended in 2014 to provide for a more lucrative salary guide for county police officers if they were merged into the BCSO. The parties refer to this provision, which was noted in the above excerpt from the ALJ's decision, as the "poison pill." Saudino contested the grievance in arbitration after the merger, when the union filed a grievance to obtain the enhanced salary under the poison pill provision.

The ALJ reasonably rejected the claim of retaliation. Among other things, she noted that Saudino explained that he fought the grievance because the additional salary it would entail if it were validated would have undermined the budgetary goals behind the effort to reduce the police force through attrition.

In addition, as we held in BCPD Layoffs II, the CSC justifiably determined, after a comprehensive review of the job functions, that the BCPD positions and the BCSO positions were not fungible. Slip op. at 21. That

16

difference further tied the hands of the Sheriff and the County officials in implementing the merger.

The ALJ expressly acknowledged the incidents cited by appellants illustrating improper bias on the part of Saudino. Even so, "[i]f [the] presumption [of the employer's good faith] is not overcome by sufficient proofs, it is of no consequence that there is proof showing that considerations other than economy underlay or played some part in that action." Schnipper v. N. Bergen Twp., 13 N.J. Super. 11, 15 (App. Div. 1951) (emphasis added). See also Bridgewater, 95 N.J. at 242 (recognizing that under analogous federal labor law principles, "the employee bears the initial burden of showing that [the employee's protected] activity . . . was a 'substantial factor' or a 'motivating factor' in the employer's action.").

The presumption of good faith is more difficult to overcome in the present context of a mass layoff than in challenges to individual terminations. See Prosecutor's Association of Essex County, 130 N.J. Super. at 43 (bad faith motivations "most often surface[] in the form of action taken against an individual employee, rather than large groups of similarly situated personnel").

On the whole, there is substantial evidence in the record to support the ALJ's credibility-based and detailed findings about the employer's lack of bad

faith in implementing the layoff plan. As the ALJ found, the layoffs were not spontaneously initiated by Saudino, but instead were "years in the making[.]"

There is sufficient evidence that that Saudino—despite his largely admitted instances of improper remarks and conduct[5]—implemented the layoffs because of the imperative to enhance the BCSO's staffing of security officers within the courthouse under the budgetary constraints imposed by statute and otherwise. As the ALJ summed it up, the record was "clear that the layoff was motivated by a genuine view of how to efficiently deliver police services in Bergen County."

The CSC did not misapply its authority as the responsible administrative agency in adopting the ALJ's detailed findings. We affirm its final agency decision, mindful of our limited scope of review.

We express a different disposition with respect to appellants' separate arguments concerning the County's rescission of its settlement offer. As we have noted, the County ceased allowing BCPD employees to accept its earlier offer once the ALJ issued her decision. The limited record on this issue suggests

---

[5] We do not by any means condone the improper remarks and conduct described by appellants at the administrative hearing. Nor did the ALJ. Instead, the ALJ found that those remarks and conduct, though improper, were not the proven cause that propelled the layoff plan. It is that amply supported finding of a lack of causation that is dispositive to this appeal.

A-0032-21

that individual employees who had expressed their acceptance of the offer and who had allegedly relied on being able to do so, were denied the benefit of the settlement after the ALJ ruled on the merits of the bad faith claim.

In their brief on appeal, appellants request that we order the County respondents to "honor the settlement" and direct its enforcement. This is not the appropriate forum to adjudicate such claims in the first instance. Our role is to review trial court and administrative agency decisions. See R. 2:2-3(a). The ALJ and the CSC did not resolve or address these claims. We have no tribunal's decision on the subject to review and no appellate jurisdiction.

Consequently, as a jurisdictional point, we make clear that our affirmance of the CSC's July 21, 2021 final agency decision is without prejudice to one or more appellants filing an appropriate complaint in the trial court seeking relief concerning the revocation or withdrawal of the settlement offer. If such a complaint is filed, the named defendants would reserve the right to interpose applicable defenses. We do not comment on whether such defenses would be viable, or about the possible merits of such lawsuits.

Lastly, we briefly note appellants' arguments that the implementation of the layoff plan deprived them of their constitutional rights of association and contravened their settled expectations. Relatedly, they contend that the layoff

violated principles of equitable estoppel. But see Meyers v. State Health Benefits Comm'n, __ N.J. __, __ (2023) (slip op. at 6) (noting estoppel against the government is generally disfavored). The ALJ properly found the claims of constitutional deprivation and estoppel lacked merit. Her decision noted that although the affected officers seemed genuinely misled, no evidence was presented of more than a "feeling" of pretextual motivation for the layoffs. Nor was any detrimental reliance alleged before the ALJ or on appeal. Similarly, the First Amendment associational claims must fail because appellants failed to establish that Saudino's anti-union remarks caused the layoff decisions. The record corroborates this lack of causation and accordingly the CSC properly affirmed the ALJ's rejection of appellants' free speech and estoppel claims. To be clear, appellants' open claims of estoppel that can be adjudicated in the trial court are confined to solely the County's rescission of its settlement offer.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20

A-0032-21